UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————X
 LARRY THOMPSON,

                                        Plaintiff,


                    -against-


THE CITY OF NEW YORK, POLICE OFFICER                    Case No.:  14-cv-7349
PAGIEL CLARK, Shield # 28472,
POLICE OFFICER PAUL MONTEFUSCO,
Shield # 10580, POLICE OFFICER GERARD
BOUWMANS, Shield # 2102, POLICE OFFICER
PHILLIP ROMANO, Shield # 6295, POLICE
OFFICER WARREN RODNEY, Shield # 13744,
SERGEANT ANTHONY BERTRAM, Shield #277.
POLICE OFFICERS JOHN/JANE DOE(S) #S 1-10,

                                        Defendants.

————————————————————————X


_____

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS**

_____



LAW OFFICE OF DAVID ZELMAN

ATTORNEY FOR PLAINTIFF LARRY THOMPSON

612 EASTERN PARKWAY

BROOKLYN NEW YORK 11225

## TABLE OF AUTHORITIES

### Statutes

42 USC §1983 ................................................................................................................. 4

Fourth Amendment ........................................................................................................ 20

NYPL 205.30 ................................................................................................................. 22

PL § 195.05 ................................................................................................................... 21

### Rules

Fed. R. Civ. P. 56 ........................................................................................................... 4

Fed. R. Civ. P. 56(c) ...................................................................................................... 4

### Treatises

*LaFave, Search and Seizure* § 6.6(a), at 400-01 (3d ed. 1996)). ................................. 24

### Federal Cases

Abdella v. O'Toole, 343 F. Supp. 2d 129, 139 (D.Conn. 2004) .................................... 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) .......................................... 5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50 ..................................................... 5

*Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003) ......................................... 13

*Anthony v. City of New York*, 339 F.3d 129, 135-136 (2d Cir. 2003) ......................... 15

*Battle v. Recktenwald*, 2016 U.S. Dist. LEXIS 20432 (S.D.N.Y. Feb. 19, 2016) ........ 5

*Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)......................................... 5

*Burke v. Cicero Police Dep't*, 2011 U.S. Dist. LEXIS 34266 at 4-6 (N.D.N.Y. 2011)........... 23

*Casale v. Kelly*, 710 F. Supp. 2d 347, 365 (S.D.N.Y. 2010) ....................................... 28

*Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986) ...................................................... 4

*Celotex Corp. v. Catrett*, 477 U.S. at 323 ..................................................................... 5

*Dawson v. Cty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) ............................... 5

*DeMeo v. Kean*, 754 F. Supp. 2d 435, 448-49 (N.D.N.Y. 2010)................................. 27

*Diehl v. Munro*, 170 F. Supp. 2d 311, 316 (N.D.N.Y. 2001)...................................... 22

Dorman v. United States, 140 U.S. App. D.C. 313, 435 F.2d 385, 391 (D.C. Cir. 1970) ......... 13

*Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir. 1970)................................... 17

*Florida v. J.L.*, 529 U.S. 266, 274 (2000)................................................................... 16

*Good v. Dauphin County Social Services for Children & Youth*, 891 F.2d 1087, 1094 (3d Cir. Pa. 1989)23

*Graham v. Connor*, 490 U.S. 386, 397 (1989)............................................................ 12

*Harris v. O'Hare*, 770 F.3d 224, 235 (2d Cir. 2014).................................................. 18

*Jackson v. City of New York*, 29 F.Supp.3d 161 (E.D.N.Y. 2014) .............................. 16

*Kentucky v. King*, 563 U.S. 452, 469-70 (2011) .................................................... 20, 21

*Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001)................................. 12

*Kerman*, 261 F.3d 229, 238 (2d Cir. 2001)................................................................. 13

*King v. Fort Wayne*, 590 F. Supp. 414, 423 (N.D. Ind. 1984) .................................... 22

*Kohler v. Englade*, 470 F.3d 1104, 1110 (5th Cir. 2006) ........................................... 19

*Kronisch v. U.S.*, 150 F.3d 112, 126 (2d Cir. 1998) ................................................... 27

*Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002)............................................... 22

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 540-541 (2001) ................................................ 15

*MacDonald*, 916 F.2d 769-770 ....................................................................................................... 17

*Manganiello v. City of New York*, 612 F.3d 149, 166 (2d Cir. 2010) ............................................ 27

*McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007) ............................................................ 12

*Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) ................. 23, 24

*Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011) ...................................................................... 5

*Novick v. AXA Network, LLC*, 2014 U.S. Dist. LEXIS 150004, at *22-23 (S.D.N.Y. 2014) ................... 26

*O'Donnell v. Brown*, 335 F.Supp. 2d 787 (W.D. Mich. 2004) ....................................................... 15

*Palmieri v. Kammerer*, 690 F. Supp. 2d 34, 45 (D. Conn. 2010) ................................................. 24

*Palmieri v. Kammerer*, 690 F.Supp.2d 34 (CT Dist. Ct. 2010) .................................................... 14

*Patrizio v. Nelson*, 2016 U.S. Dist. LEXIS 83891 (E.D.N.Y.) ...................................................... 13

*Payton v. New York*, 445 U.S. 573, 586 (1980) ............................................................................ 12

*Penree v. City of Utica*, 2016 U.S. Dist. LEXIS 27668, at *46-47 (N.D.N.Y.) .............................. 20

*Penree v. City of Utica*, 2016 U.S. Dist. LEXIS 27668, at 43-44 (N.D.N.Y. Mar. 4, 2016) ..................... 18

*Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F.Supp.2d 456, 469
(S.D.N.Y. 2010) ........................................................................................................................... 26

*R.F.M.A.S., Inc. v. So*, 606 F. Supp. 2d 497, 499, at n. 2 (S.D.N.Y. 2009) ................................. 26

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) ................... 29

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)) ................... 25

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) ................... 28

*Roguz v. Walsh*, 2012 U.S. Dist. LEXIS 172644 (CT Dist. Ct.) .................................................... 16

*See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) ............. 5

*Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 382 (S.D.N.Y. 2014) ......................................... 29

*Sikut*, 488 F.Supp.2d 291, 308. (W.D.N.Y. 2007). .................................................................... 14

*Sikut*, 488 F.Supp.2d 291, 308-309 .............................................................................................. 24

*Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2011) .............................................. 13, 23

*Taylor v. City of N.Y.*, 293 F.R.D. 601, 610-11 (S.D.N.Y. 2013) ................................................ 26

*Taylor v. City of New York*, 293 F.R.D. 601, 609 (S.D.N.Y. 2013) ............................................. 25

*Taylor v. City of New York*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013) ............................................. 27

*Taylor v. City of New York*, 293 F.R.D. 601, 616 (S.D.N.Y. 2013) ............................................. 29

*Tenenbaum v. Williams*, 193 F.3d 581, 602-605 (2d Cir. 1999) ............................................ 13, 23

*Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) .............................................................. 12

*Tierney*, 133 F.3d at 197-98 ......................................................................................................... 24

*United States v. Black*, 466 F.3d 1143, 1147 (9th Cir. 2006) ...................................................... 13

*United States v. Bridges*, 2008 U.S. Dist. LEXIS 47850 (W.Va.N.Dist) ..................................... 17

*United States v. Brightwell*, 563 F.2d 569, 575 (3d Cir. 1977) .................................................... 19

*United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995)) ........................................................... 17

*United States v. Chambers*, 395 F.3d 563, 568-569 (6th Cir. 2005) ...................................... 20, 21

*United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) ................................................. 17

*United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012) ............................................................ 17

*United States v. Moreno*, 701 F.3d 64, 75 (2d Cir. 2012) ............................................................ 20

*United States v. Najar*, 451 F.3d 710, 719 (10th Cir. 2006) ....................................................... 13

*United States v. Sikut*, 488 F.Supp.2d 291 .................................................................................. 17

*United States v. Sikut*, 488 F.Supp.2d 291, 307 (W.D.N.Y. 2007) .............................................. 13

*United States v. Sikut*, 488 F.Supp.2d 291, 308-309 (W.D.N.Y. 2007)......................................................16

*United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011). ....................................................................12

Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984)......................................................................................13

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) ..................................................25

*Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010).......................................................................5

*Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) ............................................5

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004)....................................................26

## State Cases

*People v. Ford*, 2016 NY Slip Op 26225, ¶ 3, 53 Misc. 3d 318, 321, 36 N.Y.S.3d 374, 378 (Crim Ct.) ..21

## PRELIMINARY STATEMENT

On or about December 17, 2014 Plaintiff initiated the current action pursuant to 42 USC

§1983 to seek redress for false arrest, excessive force, malicious prosecution, failure to intervene,

denial of medical treatment and due process violations.  Plaintiff now moves for partial summary

judgment, pursuant Fed. R. Civ. P. 56 on his claims of false arrest and Fourth Amendment

violations surrounding the illegal entry into his home.  Plaintiff also seeks sanctions and

attorneys' fees as against Defendants based on their spoliation of evidence, specifically,

transcripts of a 911 call.

## STANDARD OF REVIEW

"The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when it "might affect

the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or

unnecessary" are not material and thus cannot preclude summary judgment. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine if there is

sufficient evidence upon which a reasonable jury could return a verdict for the non-moving

party. *See id*. The Court "is not to resolve disputed issues of fact but to assess whether there are

any factual issues to be tried." *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)

(citation omitted). It is the moving party's burden to establish the absence of any genuine issue of

material fact. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). If the

non-moving party has failed to make a sufficient showing on an essential element of his case

with respect to which he has the burden of proof, then summary judgment is appropriate. *Celotex*

*Corp. v. Catrett*, 477 U.S. at 323. If the non-moving party submits evidence which is "merely colorable," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. *Dawson v. Cty. of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004). On summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011). If there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)." *Battle v. Recktenwald*, 2016 U.S. Dist. LEXIS 20432 (S.D.N.Y. Feb. 19, 2016).

## **FACTUAL OVERVIEW**

Plaintiff is a veteran of the United States Navy and a full time employment of the United States Postal Service since 1994.   On January 15, 2014 at approximately 10:00 pm, a call was made to 911 by an anonymous caller. (Def. Ex. A) (See Defendants' Disclosures, hereinafter "Pl. Ex. A," p. 12). The caller alleged "possible child abuse" at 399 Lincoln Place, Apt 2E in Brooklyn. (Def. Ex. A). The apartment in question is and was the residence of Plaintiff and Plaintiff's family, his fiancé Talleta (now wife), his daughter Nalah and his son Zacariah. (EBT Thompson, hereinafter "Pl. Ex. B," p. 8 line 10 – p. 9 line 20). Earlier that day, Plaintiff and his fiancé, Talleta Watson, had taken their newborn baby, Nalah to a doctor's appointment. (Pl. Ex.

B, p. 13 lines 21-24). The caller stated that the baby had red rashes on her buttocks and was concerned regarding Plaintiff "possibly abusing" the baby. (Def. Ex. A). The anonymous caller did not state that any abuse was in progress at the time of the call.  (Def. Ex. A) (Affidavit of Camille Watson, hereinafter "Pl. Ex. C," ¶ 2). The caller did not state that she had ever observed Plaintiff abusing the baby. (Pl. Ex. C, ¶ 3). The caller did not state that she was in any danger herself. (Def. Ex. A). Automatic Location Identification indicated that the call was made  at a location other than the location of the requested assistance. (Def. Ex. A).  The dispatcher noted that the caller was "in front of" the location. (Def. Ex. A). The EMTs knew that the caller had called from a location other than the location of the requested assistance. (EBT Dillahunt, hereinafter "Pl. Ex. D," p. 46 line 23 to p. 47 line 11)

Two Emergency Medical Technicians (the "EMTs") arrived unaccompanied by police. (Def. Ex. A) (Pl. Ex. D, p. 13 lines 20-22). When the EMTs met with the caller and asked her why she had called, the caller refused to explain. (Pl. Ex. D, p. 12 line 20 – p. 15 line 16). The EMTs realized that the caller was possibly mentally retarded before they entered the apartment. (Pl. Ex. D, p. 12 line 20 – p. 15 line 16, P. 18 lines 6-24) . The EMTs did not relay this information to the police because the caller's impairment was obvious to anyone who came in contact with her. (Pl. Ex. D p. 18 lines 17-24). The EMTs were not told that there was a sexual assault in progress. (Pl. Ex. D, p. 77 line 21 – p. 78 line 3).

The EMTs followed the caller to the Plaintiff's apartment. (Pl. Ex. D, p. 20 lines 6-7). The caller opened the door to Plaintiff's apartment. (Pl. Ex. D, p. 20, lines 8-10). The EMTs observed a long hallway with a kitchen on the left. (Pl. Ex. D, p. 20 lines 12-13). The EMTs proceeded through to the Plaintiff's living room, where they observed a woman sitting on the couch and holding a child. (Pl. Ex. D, p. 20 lines 13-20). The EMTs entered the living room and

asked the caller where "the patient" was. (Pl. Ex. D, p. 20 line 21-22). The caller pointed to another room and stated the baby was inside. (Pl. Ex. D, p. 21 lines 5-7, p. 34 lines 11-15). When the woman heard the Emergency Medical Technicians speaking she turned around, greeted them and asked them why they were there. (Pl. Ex. D, p. 20 lines 23-25). The EMTs asked the woman if anyone in the apartment had called an ambulance and the woman answered "no." (Pl. Ex. D, p. 20 line 25 – p. 21 line 2).

Plaintiff became aware of the EMTs inside his apartment and asked them, "what seems to be the problem?" (Pl. Ex. B, p. 20 lines 22-23) (Pl. Ex. D, p. 21 lines 6-11). The EMTs stated that "they had an anonymous phone call about a child being abused." This led the Plaintiff to believe the EMTs had mistakenly gone to the wrong apartment. (Pl. Ex. B, p. 21 lines 23-25) (Pl. Ex. D, p. 21 lines 11-12). When the Plaintiff asked the EMTs who had called 911, they told him a neighbor had called, but they did not identify the caller. (Pl. Ex. B, P. 26 lines 8-14). The Plaintiff advised the EMTs that nobody in the apartment had called for help. (Pl. Ex. B, p. 23 lines 12-18) (Pl. Ex. D, p. 21 lines 12-13). At this point the EMTs made up a lie, to wit that they must have gone to the wrong apartment. (Pl. Ex. D, p. 21 lines 14-18). The Plaintiff suggested other apartments in his building which had children and thus may have been the source of the complaint. (Pl. Ex. B, p. 23 line 19 – p. 24 line 13). The EMTs then left the apartment. (Pl. Ex. B, p. 23 line 19 – p. 24 line 13). During this time the EMTs never asked to speak to the mother of the baby. (Pl. Ex. B, p. 24 lines 14-18).

After leaving the apartment, one of the EMTs radioed for the police. (EBT Marturano, hereinafter "Pl. Ex. E", p. 13 line 21 – p. 14 line 2). The EMTs recognized they had no right to enter where they were not welcome, and hoped the police would grant entry. (Pl. Ex. E, p. 13 lines 13-20). Approximately five minutes after the EMTs had left, the police arrived and

knocked on the Plaintiff's door. (Pl. Ex. B, p. 26 lines 20-23). The officers intended to investigate "what was going on" inside the apartment. (EBT Montefusco, hereinafter "Pl. Ex. F," p. 35 lines 7-14, p. 40 lines 4-12). The Plaintiff answered the knock and spoke with the police. (Pl. Ex. B, p. 30 lines 10-20).  The police told the Plaintiff that they wanted to enter the apartment. (Pl. Ex. B, p. 35 lines 16-23) (Pl. Ex. D, p. 23 lines 4-7). Plaintiff asked them for "a good reason" why they needed to enter the apartment. (Pl. Ex. B, p. 35 lines 22-25). Defendant Montefusco stated the police had received a call and needed to come in. (Pl. Ex. F, p. 33 lines 15-17) (Pl. Ex. B, p. 35 lines 20-21). When Plaintiff asked for a reason, the officers stated they had received an anonymous tip from a neighbor alleging child abuse. (Pl. Ex. B, p. 37 lines 20-24). Plaintiff was incredulous and asked the police if "just anybody" could make an anonymous call and trigger a search of the home. (Pl. Ex. B, p. 38 lines 3-9). The Plaintiff told the Defendants, in sum and substance, that they could not enter without a warrant. (Pl. Ex. B, p. 38 lines 11-13). (EBT Prospere, hereinafter "Pl. Ex. G," p. 44 lines -9). The Plaintiff tried to speak with the Defendants but they would not speak to him. (Pl. Ex. G, p. 44 lines 17-22). The Plaintiff told the Defendants he would not agree to their entering his apartment without a search warrant. (Pl. Ex. B, p. 38 lines 10-13) (Pl. Ex. G, p. 9 lines 20-22, p. 51 line 23 – p. 52 line 1, p. 53 lines 20-24). Plaintiff refused to allow the police to enter, and stated that nobody in the home had called 911. (Pl. Ex. D, p. 23 lines 7-10). The police never requested or suggested that Plaintiff bring the baby to the door so that the EMTs could observe the baby. (Pl. Ex. B, p. 35 line 20 – p. 38 line 20).  The Defendants did not warn Plaintiff that he would be arrested if he refused them entry. (Pl. Ex. F, p. 40 line 20 – p. 41 line 3). Without consulting a supervisor or being directed thereby, Defendant Montefusco decided the Defendants should forcibly enter the apartment. (Pl. Ex. F, p. 35 lines 7-20). The four officers with defendant Montefusco, Officers Clark,

Bouwmans, Romano and Rodney followed Montefusco's lead and did nothing to stop the warrantless entry into the premises.  Defendant Sgt. Bertram was outside the premises and only responded to the scene once plaintiff was in custody.

While plaintiff was standing in the doorway, defendant Montefusco admits that he attempted to enter the apartment, made contact with the Plaintiff and attempted to move Plaintiff out of the way in order to effect entry. (Pl. Ex. F, p. 41 line 21 – p. 45 line 9).  Defendant Montefusco grabbed the Plaintiff by the shoulder, but the Plaintiff recovered and stepped back in front of the door. (Pl. Ex. F, p. 39 line 23 – p. 40 line 19).  The Plaintiff stood his ground and attempted to maintain his position in the doorway. (Pl. Ex. B, p. 41 line 21 – p. 45 line 9). Plaintiff never pushed an officer. (Pl. Ex. B, p. 44 lines 14-23) (Pl. Ex. G, p. 52 lines 2-3). Defendant Montefusco grabbed Plaintiff and started choking him. (Pl. Ex. B, p. 38 lines 13-16). The Defendants threw Plaintiff to the floor, and then punched and kicked him. (Pl. Ex. B, p. 38 lines 16-20). The Defendants continued beating the Plaintiff until his neighbor asked them to stop. (Pl. Ex. B, p. 39 lines 14-17). The Defendants forced the Plaintiff to the floor, planted a knee in his back and handcuffed him. (Pl. Ex. F, p. 41 line 21 – p. 45 line 9) (Pl. Ex. D, p. 63 lines 4-24) (EBT Nurse, hereinafter "Pl. Ex. H," p. 7 lines 21-25, p. 16 lines 23-25, p. 25 line 16 – p. 26 line 4). Over the Plaintiff's objections, the defendants forced their way into his apartment. (Pl. Ex. F, p. 41 line 21 – p. 45 line 9). Montefusco had not spoken to the 911 caller before forcing his way into the apartment and did not know her name.  (Pl. Ex. F. p. 39 line 3-31). The force of the Defendants' seizure of Plaintiff and entry into the apartment shocked his neighbor and caused her to wake her mother who had slept through events until then. (Pl. Ex. G, p. 37 line 25 – p. 38 line 3) (Pl. Ex. H, p. 13 line 17 – p. 14 line 3).

After entering the apartment with the police, the EMTs examined the baby. (Pl. Ex. D, p. 25 lines 18 – 22). The EMTs determined at the scene that the baby only had a diaper rash and relayed this information to the police. (Pl. Ex. D, p. 25 lines 23 – 25). The Defendants and the EMTs were inside the bedroom, where the baby was, for at least 20 minutes. (Pl. Ex. B, p. 52 lines 14-22). Sometime after seizing the Plaintiff, the police asked the caller why she had called 911. (Pl. Ex. D, p. 36 lines 18-20). The caller stated she had called 911 because the baby cried loudly when the Plaintiff was changing her diaper. (Pl. Ex. D, p. 36 lines 20-23). The police did not speak to the caller at all until after the Plaintiff had been placed in handcuffs. (Pl. Ex. D, p. 39 lines 7-10). Likewise, the EMTs did not determine the caller's relationship to the Plaintiff's family, or that she resided in the apartment, until after the Plaintiff had been arrested and the EMTs had departed the scene. (Pl. Ex. D, p. 48 line 13 – p. 49 line 10). Furthermore, the caller did not explain to the EMTs or the police why she had called 911 until after the Plaintiff was handcuffed. (Pl. Ex. D, p. 76 lines 18-23).  According to the EMTs, she had difficulty keeping her story consistent. (Pl. Ex. E, p. 15 line 21 – p. 17 line 13). The 911 Operator had obtained a callback number for the caller, identical to the number provided by Automatic Number Identification. (Def. Ex. A). However, none of the Defendants attempted to contact the caller until after entering the Plaintiff's apartment. The Defendants did not know the caller's name at the time they entered the apartment. (Pl. Ex. F, p. 39 lines 3-8). In his report following the incident, Defendant Clark would write that the caller was anonymous.  (Pl. Ex. A. p. 12). When the officers did speak with the caller, her mental disability was immediately apparent. (Pl. Ex. F, p. 54 lines 12-19). The Defendants and the EMTs told the Plaintiff's fiancé, Talleta Watson, that she and the baby had to go to the hospital. (EBT Talleta Watson, hereinafter "Pl. Ex. I," p. 30 lines 6-12). When she told them she did not want to go, they told her they had received a call

about child abuse and she had to go. (Pl. Ex. I, p. 30 lines 14-17). Talleta went along to the

hospital because she was told she "had to go." (Pl. Ex. I, p. 32 lines 20-21).

   During the arrest, the Plaintiff was injured and bleeding. (Pl. Ex. B, p. 60 lines 4 – 24)

(Def. Ex. O). The Plaintiff was held in custody for approximately 40 hours. (Pl. Ex. A, p. 23). On

or about January 16, 2015 Defendant Pagiel Clarke drafted and signed a Criminal Complaint

accusing the Plaintiff of NYPL 195.05 Obstructing Governmental Administration in the Second

Degree and NYPL 205.30 Resisting Arrest. (Pl. Ex. A, p. 5) On or about January 17, 2014 the

Plaintiff was arraigned in Kings County Criminal Court and charged with NYPL 195.05

Obstructing Governmental Administration in the Second Degree and NYPL 205.30 Resisting

Arrest. (Pl. Ex. A, p. 5). The Plaintiff was required to make three court appearances to answer

the charges. (Pl. Ex. B, p. 73 lines 17-19). On or about April 15, 2014 the criminal case was

dismissed on a motion by Kings County District Attorney. (Pl. Ex. A, p. 4).  The Court did not

dismiss the case in the interests of justice, it simply dismissed the case as the District Attorney

moved for that relief. There was no suggestion plaintiff was ill or required assistance in any

fashion and he was prepared to challenge the charges until a verdict was entered in the case.

   On or about May 14, 2015, the undersigned served upon Defendants a demand for

production of, *inter alia*, "all transcripts of any 911 calls made relating to the incident."

(Plaintiff's First Document Demands, hereinafter "Pl. Ex. J" ¶ 29). On or about August 28, 2015,

Defendants' counsel served a Response upon the undersigned, partially objecting to the request

and referring the undersigned to the redacted Dispatcher Event Chronology contained in

Defendants' Initial Disclosures. (See Defendants' Response, hereinafter "Pl. Ex. K," ¶29) (see

also Pl. Ex. A. pp. 14-20)**.** On or about January 20, 2017 Defendants filed with this Court an un-

redacted copy of the same Dispatcher Event Chronology, annexed to their Statement Pursuant to

Local Rule 56.1 as "Exhibit A." (Def. Ex. A). To date, Defendants have failed to produce the requested 911 transcripts.

## ARGUMENT

I.   Plaintiff's Fourth Amendment Rights Were Violated Because There Were No Exigent Circumstances to Dispense with the Warrant Requirement

It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). These principles apply with particular intensity when a home is searched in the middle of the night. *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011). "Police officers may enter a dwelling to … render assistance to a person whom they reasonably believe to be in distress." *Kerman v. City of New York*, 261 F.3d 229, 235 (2d Cir. 2001) citing *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998). However, "a police officer who conducts a warrantless search or seizure inside the home bears the burden of proving that his conduct was justified." *McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007). The reasonableness of the officer's belief is to be evaluated in the light of the circumstances confronting the officer at the time. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Even where, as here, a caller alleges possible domestic abuse, "domestic violence situations are not *per se* exigent." *United States v. Sikut*, 488 F.Supp.2d 291, 307 (W.D.N.Y. 2007) citing *United States v. Najar*, 451 F.3d 710, 719 (10th Cir. 2006). See also *Patrizio v. Nelson*, 2016 U.S. Dist. LEXIS 83891 (E.D.N.Y.) citing *Sikut* at 307. Likewise, "there is no domestic abuse exception to the Fourth Amendment generally." *United States v. Black*, 466 F.3d 1143, 1147 (9th Cir. 2006). Applied to child-abuse investigations, the exception similarly permits removal of a child where the state officers making the search or seizure have probable cause to believe the child is in imminent danger of abuse. See *Tenenbaum v. Williams*,

193 F.3d 581, 602-605 (2d Cir. 1999); *Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2011).

Ultimately, "the essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Id*. at 769 (quoting *Dorman v. United States*, 140 U.S. App. D.C. 313, 435 F.2d 385, 391 (D.C. Cir. 1970) (in banc)). In answering that question, we must be cognizant of the Supreme Court's admonition that "exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

A.   The 911 call upon which the Defendants acted could not create exigent circumstances <u>because it was anonymous and not corroborated prior to the warrantless entry</u>

Police may not rely solely on an anonymous and uncorroborated 911 call to justify warrantless entry into a dwelling. *Kerman*, 261 F.3d 229, 238 (2d Cir. 2001). A 911 call can only justify warrantless entry where it bears sufficient indicia of reliability, i.e. where the call originates from a witness to or victim of an alleged crime, originates at the scene of the alleged danger, and alleges a crime in progress or an imminent danger to the caller or others. See *Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003). Thus an anonymous caller stating "that a mentally ill man at this location was off his medication and acting crazy and possibly had a gun" was not sufficient to justify a warrantless entry. *See Kerman*, 261 F.3d at 232. Where a call was verified to originate from the scene and alleged an armed man was inside the premises and presented an imminent threat to the caller, the call did justify warrantless entry. *See Anthony*, 339 F.3d at 136-137.  Likewise, an anonymous call fails to justify warrantless entry where the

10

police fail to corroborate the call and have good reason to doubt the veracity of the caller. *See Sikut*, 488 F.Supp.2d 291, 308. (W.D.N.Y. 2007).

Here, the 911 call failed to provide police with exigent circumstances for several reasons. First, the call was not corroborated whatsoever. In fact, prior to the warrantless entry the EMTS had been inside the apartment and observed nothing amiss. (Pl. Ex. D. p. 20 line 23 – p. 21 line 3). Second, the caller, who was anonymous until after the police made forcible entry was not reliable under the standards adopted in *Kerman* and *Anthony*. This is due to several reasons including her obvious mental impairment and initial refusal to answer questions as to the nature of the call to the EMT's.  Third, the call did not originate from inside the apartment; rather the caller used a cell phone associated with an entirely different address while standing outside the building. (Def. Ex. A) (Pl. Ex. D, p. 12 lines 7-8). Fourth, the caller did not state that there was a crime in progress, or that she had actually observed a crime occurring, only that she was concerned regarding "possible child abuse" (Def. Ex. A). Specifically she stated that she had observed a red rash on the baby's buttocks. (Def. Ex. A). This observation was not itself indicative of a crime or even the need for emergency medical assistance See, *Palmieri v. Kammerer*, 690 F.Supp.2d 34 (CT Dist. Ct. 2010), finding no exigent circumstances where a complaining witness reported that a person kept a firearm for protection and was "acting paranoid").  Fifth, since the EMTs admittedly observed the caller and attempted to speak to her before police arrived, they were admittedly aware of the caller's obvious mental retardation/psychological issues.  This fact simply underscores the need for some corroboration prior to a forced entry without a warrant.

Critically, the caller did not state that there was any imminent danger to herself.  This fact has been found to be significant. *See Anthony v. City of New York*, 339 F.3d 129, 135-136 (2d

Cir. 2003) ("[Defendants] knew they were responding to a 911 call from a woman inside the apartment who claimed to be at risk of immediate physical injury, requested assistance, and was potentially 'emotionally disturbed.'") The fact that the caller met the EMTs outside the building implies that she was in no imminent danger. The caller did not allege that the baby was in imminent danger.  Rather, she alleged she had seen a rash on the baby's buttocks and only explained her reason for calling to police after plaintiff was already in custody. (Pl. Ex. D. p. 36 line 11 to p. 39 line 10).

In analogous circumstances, courts have found no exigent circumstances. Where an anonymous call alleged child neglect and a police investigation revealed that several young children, one an infant, were left in the care of an older sibling, which sibling left them unattended for several hours on an evening, this speculative threat to their welfare did not justify a warrantless entry to the home over the objection of the responsible older sibling. See, *O'Donnell v. Brown*, 335 F.Supp. 2d 787 (W.D. Mich. 2004). Likewise, State statutes or regulations, even where intended to protect the welfare of children, "cannot be construed to displace the protections of the United States Constitution." *O'Donnell v. Brown*, 335 F.Supp.2d 787, 802 citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 540-541 (2001).

Here, the call was not corroborated prior to the warrantless entry. While the Defendants confirmed that a person matching the description provided by the caller lived at the address given, the mere presence of a person matching a description given by an anonymous caller would not be sufficient to justify a *Terry* stop, let alone a warrantless entry to the Plaintiff's home. See *Florida v. J.L.*, 529 U.S. 266, 274 (2000). Where, as here, police fail to corroborate an anonymous call and actually have reason to doubt the caller's veracity, the call does not justify a warrantless entry. See *United States v. Sikut*, 488 F.Supp.2d 291, 308-309 (W.D.N.Y. 2007).

Here, the officers made no effort to speak with the caller before entering Plaintiff's home. The officers had access to a callback number by which they could have contacted the caller. (Def. Ex. A). However, none of the Defendants attempted to speak with the caller until after the warrantless entry. (Pl. Ex. F, p. 39 lines 3-8). Had they done so, they would have quickly realized her obvious cognitive disability (Pl. Ex. F, p. 54 lines 12-19). They would have then reasonably concluded that she was not a reliable source of information.

Likewise, Defendants point to no observations made prior to the warrantless entry which would corroborate the caller's allegations or lead a reasonable person to believe exigent circumstances existed. Defendants arrived late at night to a quiet house. The Plaintiff and his fiancée were, unsurprisingly, dressed in little more than underclothes as if ready to turn in for the night. In fact, Plaintiff's neighbor was already asleep and only woke up when the Defendants forced their way into Plaintiff's apartment. Wherever circumstances have justified warrantless entry, police typically observed circumstantial evincing recent, imminent or ongoing disturbance. See *Jackson v. City of New York*, 29 F.Supp.3d 161 (E.D.N.Y. 2014) (police heard plaintiff's niece shout "they are fighting!" while investigating report of an armed man); *Roguz v. Walsh*, 2012 U.S. Dist. LEXIS 172644 (CT Dist. Ct.) (while investigating a 911 call from neighbor, police were confronted by shouting, belligerent and visibly intoxicated plaintiff). Where, as here, police observed "nothing out of the ordinary" as to corroborate a report of a disturbance, Courts have held there was no justification for a warrantless entry. See *United States v. Sikut*, 488 F.Supp.2d 291; *United States v. Bridges*, 2008 U.S. Dist. LEXIS 47850 (W.Va.N.Dist).

    B. The circumstances at the time the Defendants arrival at the Plaintiff's apartment did not show the existence of exigent circumstances and therefore did not justify the warrantless <u>entry</u>

Alternatively, "the essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990); citing *Dorman v. United States*, 435 F.2d 385, 391 (D.C. Cir. 1970). The *Dorman* factors adopted by the Second Circuit include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry." *MacDonald*, 916 F.2d 769-770; *United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012). Where the *Dorman* factors are inapplicable, "federal courts, including [the Second Circuit,] have considered an additional factor, namely whether quick action is necessary to prevent the destruction of evidence." *Moreno*, 701 F.3d at 73 (alteration omitted) (citing *United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995)).

The first five *Dorman* factors have limited applicability because the Plaintiff was not a suspect of any crime when the officers made initial entry into the premises.   Even assuming *arguendo* that the Defendants had some suspicion of Plaintiff, these factors do not militate in favor of exigency. The first factor, "the gravity or violent nature of the offense," does not militate in favor of exigency where there is no underlying offense, but only a tip alleging "possible abuse" which the caller later clarified to mean the baby had a diaper rash and cried loudly. See *Harris v. O'Hare*, 770 F.3d 224, 235 (2d Cir. 2014) ("no 'underlying offense,' only a tip about guns left in an abandoned Maxima.")  According to the officers, at the time they sought entry to the apartment, did not seek to charge him with any crime, but only to "investigate what

was going on." (Pl. Ex. F, p. 35 lines 11-14, p. 40 lines 4-9). Furthermore, Defendants allege that that Plaintiff was standing in the doorway of the apartment while speaking to them. (Pl. Ex. F p. 31 lines 13-19). Had they intended to arrest and charge Plaintiff and had probable cause to do so, by their own account they could have done so then and there. That they did not do so indicates they did not have probable cause to believe he had committed a crime. Likewise, the second factor "whether the suspect is reasonably believed to be armed" does not militate in favor of exigency because the caller never stated or implied to 911 that the Plaintiff was armed (Def. Ex. A), and the Defendants never expressed any concern that the Plaintiff was armed. Furthermore, Defendants could see that Plaintiff was unarmed because of how he was dressed, ready for bed. (Pl. Ex. F p. 28 line 24 – p. 29 line 4). Defendant Montefusco also approached within arm's reach of the Plaintiff, and actually laid hands on him to remove him from in front of the doorway. (Pl. Ex. F, p. 39 line 23 – p. 40 line 19). Even granting *arguendo* Defendants' allegations that Plaintiff  "seemed angry" or "was shouting," this is not sufficient to support the belief that Plaintiff was armed. See *Penree v. City of Utica*, 2016 U.S. Dist. LEXIS 27668, at 43-44 (N.D.N.Y. Mar. 4, 2016) ("Defendant Skibinski described Plaintiff Penree's past interaction with police as "passively aggressed." Although Plaintiff Penree was observed by Defendants to be agitated in his residence, he was not violent, and he did not use any foul language. Defendants have failed to present evidence in this case that is sufficient to establish a reasonable belief that Plaintiff Penree was armed, and, accordingly, the second Dorman factor also weighs against finding exigent circumstances.")  Regarding the third factor, "a clear showing of probable cause to believe the suspect committed the crime," as argued above, had the Defendants had probable cause to believe Plaintiff had committed a crime, they would have arrested him immediately, as he allegedly stood outside the apartment. See *United States v. Brightwell*, 563 F.2d 569, 575 (3d

15

Cir. 1977) ("The police knocked (or attempted to knock) at the Brightwell door and allegedly paused to converse with the first individual who came out.  When Brightwell himself was later seen by officers who knew him, he was not immediately placed under arrest.") Here the officers did not arrest plaintiff until after he refused to consent to their warrantless entry. Furthermore, the facts and circumstances known to Defendants, an anonymous and uncorroborated tip that the baby had a rash could not constitute a clear showing of probable cause. See *Kohler v. Englade*, 470 F.3d 1104, 1110 (5th Cir. 2006) ("an anonymous tip, standing alone, is rarely sufficient to provide probable cause for a warrant"). The fourth factor, "a strong reason to believe the suspect is in the premises" does not militate in favor of exigency where, as here, there is no suspect. The goal of the Defendants in seeking entry to the apartment was not to arrest the Plaintiff, but rather to "investigate what was going on." (Pl. Ex. F, p. 35 lines 11-14, p. 40 lines 4-9).  However, it was readily apparent to all involved that plaintiff was present and talking to the officers. Regarding the fifth factor "a likelihood that the suspect will escape if not swiftly apprehended," it is uncontested that the Plaintiff spoke openly to the Defendants and made no attempt to escape or even refuse to open the door. (Pl. Ex. B, p. 30 lines 10-20) (Pl. Ex. F, p. 31 lines 6-23).  When the police knocked on the door and spoke with the Plaintiff, he made no attempt to leave the apartment and in fact refused to move from the door, despite attempts by the Defendants to move him bodily (Pl. Ex. F, p. 39 line 23 – p. 40 line 19).

The sixth *Dorman* factor, "the peaceful circumstances of the entry," and the extra *Moreno* factor "whether quick action is necessary to prevent the destruction of evidence," do not militate in favor of exigent circumstances. Here, the Defendants initiated the use of force by grabbing Plaintiff and attempting to move him bodily from the doorway of the apartment. (Pl. Ex. F, p. 39 line 23 – p. 40 line 19). The Plaintiff refused to be moved and stepped back in front

of the door. (Pl. Ex. F, p. 39 line 23 – p. 40 line 19). "Such a retreat and refusal to allow …

armed officers into the home is every citizen's right under the Fourth Amendment, the very

reason for its creation. The exercise of this fundamental right against armed invasion of the home

is certainly not, as the government seems to imply, the 'equivalent' to yelling 'destroy the drugs'

— or 'get your guns ready' or 'try to hide or destroy the boiler and all the lab equipment.' The

exercise of a constitutional right at the front door of your home not to consent to talk or allow a

search does not create an exigency justifying a warrantless entry." *United States v. Chambers*,

395 F.3d 563, 568-569 (6th Cir. 2005). See also *United States v. Moreno*, 701 F.3d 64, 75 (2d

Cir. 2012) ("when police without a warrant knock on an individual's door, that person 'need not

allow the officers to enter the premises and may refuse to answer any questions at any time.'")

citing *Kentucky v. King*, 563 U.S. 452, 469-70 (2011). When the Plaintiff asserted his rights and

refused to allow entry into the apartment, the Defendants overpowered plaintiff and handcuffed

him. Therefore, the circumstances of the Defendants' entry were not peaceful and this factor

militates against the existence of exigent circumstances. See *Penree v. City of Utica*, 2016 U.S.

Dist. LEXIS 27668, at *46-47 (N.D.N.Y.) ("[Plaintiff] cracked open his front door while

positioning his foot to prevent the door from opening wider. … [Defendants] then forcibly

pushed the door open, even after the door stopped against his foot, and pressed their way into the

home."). Regarding "whether quick action was necessary to prevent the destruction of evidence,"

the Defendants maintain that they sought entry to the apartment to examine the baby and have

not alleged any concern for evidence.  Likewise, the Defendants did not observe any attempt by

Plaintiff to destroy evidence or to direct third persons to destroy evidence. See *Moreno*, 701 F.3d

64, 75 citing *Chambers*, 395 F.3d 563, 577 (6th Cir. 2005); ("the question remains whether the

resident's reaction is the verbal, visual or aural equivalent of 'The police are here, destroy the drugs.'").

II.     Plaintiff's Fourth Amendment Rights Were Violated Because There Was No Probable Cause to Arrest and Prosecute Plaintiff for Refusing Entry to His Home and Insisting That Defendants Obtain A Warrant

"A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." PL § 195.05. *People v. Ford*, 2016 NY Slip Op 26225, ¶ 3, 53 Misc. 3d 318, 321, 36 N.Y.S.3d 374, 378 (Crim Ct.).  Here, there is no colorable argument that plaintiff acted "by means of intimidation, physical force or interference, or by means of any independently unlawful act." Rather, the allegation was that Plaintiff stood upon his Fourth Amendment rights and demanded that the Defendants obtain a warrant before he would allow them into his home.  The exercise of a constitutional right at the front door of a citizen's home not to consent to talk or allow a search does not create an exigency justifying a warrantless entry." *United States v. Chambers*, 395 F.3d 563, 568-569 (6th Cir. 2005). Likewise "even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Kentucky v. King*, 563 U.S. 452, 469-70 (2011). Because the Plaintiff took no action besides standing at his front door and insisting upon a warrant, the Defendants did not have probable cause to believe he was obstructing their investigation were it carried out lawfully within the bounds of the Fourth Amendment.  If there was no probable cause for the Obstruction charge, there was by definition no probable cause for resisting arrest as the

18

resisting arrest charge requires an underlying offense worthy of an arrest  *Diehl v. Munro*, 170 F. Supp. 2d 311, 316 (N.D.N.Y. 2001) (Court finding that there must be probable cause for obstruction in order for a valid resisting arrest charge.)

Even assuming *arguendo* that Defendants had probable cause to arrest Plaintiff for Obstructing Governmental Administration, this did not create exigent circumstances as to justify a warrantless entry into Plaintiff's apartment. *Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002) ("The Supreme Court recently reiterated the firmly established rule that police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.")  Defendants have alleged that Plaintiff was standing adjacent to the doorway to his apartment when he allegedly "obstructed" them. (Pl. Ex. F, p. 31 lines 13-19). Under the New York Penal Law, both Obstructing Governmental Administration in the Second Degree and Resisting Arrest are Misdemeanors. (See NYPL 195.05 and NYPL 205.30). Where, as here, "the matters involved in a seizure are misdemeanors, a seizure of a suspect in a public place is not a sufficient exigent circumstance to justify a forcible, warrantless, nonconsensual entry into a private residence." *King v. Fort Wayne*, 590 F. Supp. 414, 423 (N.D. Ind. 1984).

In analogous circumstances, Courts have found exigent circumstances to be absent. In *Burke v. Cicero Police Dep't*, the Defendant officers were outside Plaintiff's residence to issue her an appearance ticket for Obstructing Governmental Administration in the Second Degree and Harassment in the Second Degree. Defendants asked Plaintiff to step outside. Plaintiff refused and stated she was retreating into the house to make a phone call. Thereupon Defendants attempted to gain entry to the house. When they were unable to do so, one Defendant kicked in the dead-bolted door and proceeded to arrest Plaintiff in her home. *See Burke v. Cicero Police Dep't*, 2011 U.S. Dist. LEXIS 34266 at 4-6 (N.D.N.Y. 2011). Applying the *Dorman* test for

19

exigency, the Northern District found that, "Plaintiff's refusal to exit her home to allow the officers to serve her with an appearance ticket is not an exigent circumstance justifying their conduct." See *Id.,* at 13

III.     The Defendants Exceeded the Scope of Any Privilege they may have had to Enter the Apartment, Without Exigent Circumstances And Without Probable Cause

"Where a warrantless search is justified by exigent circumstances, the search "must be strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). The state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat. See *Good v. Dauphin County Social Services for Children & Youth*, 891 F.2d 1087, 1094 (3d Cir. Pa. 1989). Applied to child-abuse investigations, exigent circumstances permit removal of a child where the state officers making the search or seizure have probable cause to believe the child is in imminent danger of abuse. See *Tenenbaum v. Williams*, 193 F.3d 581, 602-605 (2d Cir. 1999); *Southerland v. City of New York*, 680 F.3d 127 (2d Cir. 2011). Even assuming *arguendo* that exigent circumstances existed to justify the warrantless entry of Plaintiff's apartment and warrantless seizure of Plaintiff's person, that exigency evaporated once Plaintiff was in handcuffs. Furthermore, once the EMTs examined the baby and determined that she had a mere diaper rash, the uncorroborated phone call, upon which Defendants had initiated their investigation, was shown to be unreliable and therefore could not justify a warrantless search. See *Sikut*, 488 F.Supp.2d 291, 308-309 (based on the prior inaccurate 911 call and "the absence of independent evidence directly corroborating the present caller's complaint, it was not objectively reasonable for the officers to conclude that the 911 caller was sufficiently reliable to demonstrate that exigent circumstances were present").

Furthermore, assuming *arguendo* that there were some exigent circumstances to justify the warrantless entry, the Defendants here exceeded the scope of whatever exigency might have existed. Once an officer enters a residence under the emergency aid exception, he may properly conduct a limited search of the premises if it is objectively reasonable for him to believe that the search is necessary to ensure the safety of someone therein. The search must be "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) . The Second Circuit has observed:

> "As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case basis, taking into account the type of emergency which appeared to be present.... The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry — the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance." *Tierney*, 133 F.3d at 197-98 (quoting 3 *LaFave, Search and Seizure* § 6.6(a), at 400-01 (3d ed. 1996)).

Courts construing *Tierney* have found that the facts of the case are highly relevant to determine whether officers exceeded the scope of any privilege to enter the premises. For example, in *Palmieri v. Kammerer*, 690 F. Supp. 2d 34, 45 (D. Conn. 2010) , the Court concluded a trial was necessary and held:

> Here, the officers were invited into Palmieri's living room. Therefore, their initial entry into the house is justified based on consent. However, even if the officers based their initial entry on rendering emergency assistance to Palmieri, the facts taken in the light most favorable to the plaintiff do not demonstrate that exigent circumstances existed for them to enter the kitchen. The facts do not indicate that Palmieri moved to leave the living room or enter the kitchen at any time. Therefore, any potential emergency situation or aid that Palmieri might have required could have been addressed in the living room. Aside from seeing the gun in plain view (which is a disputed issue of material fact), the facts do not demonstrate that the officers had reason to believe that anything in the kitchen required their immediate attention or assistance. Therefore, because a reasonable jury could conclude that no exigent circumstances existed justifying a warrantless entry and warrantless search of the kitchen, summary judgment should be denied. See Abdella v. O'Toole, 343 F. Supp. 2d 129, 139 (D.Conn. 2004) (holding that summary judgment is denied because a reasonable jury could easily conclude that no exigent circumstances

existed to justify a warrantless search of the home).

Here the Defendants, after subduing Plaintiff, entered Plaintiff's bedroom where they remained for about 20 minutes. (Pl. Ex. B p 52 lines 14-22). Once the EMTs determined the baby had a diaper rash (Pl. Ex. D, p. 25 lines 23 – 25), there was no requirement to render emergency aid. At that point, there could be no exigency requiring the Defendants to remain in the apartment. Notwithstanding, Defendants remained in the apartment for about twenty minutes and then ordered Plaintiff's fiancé to go to the hospital against her will.

<u>Defendants' Spoliation of the 911 Transcript Should Be Sanctioned</u>

"Spoliation" is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). "A party seeking sanctions for spoliation of evidence must establish the following three elements: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim . . . such that a reasonable trier of fact could find that it would support that claim.'" *Taylor v. City of New York*, 293 F.R.D. 601, 609 (S.D.N.Y. 2013) (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

"The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004). Sanctions can include a variety of measures, from "further discovery, cost-shifting, fines, special jury instructions, preclusion, and

the entry of default judgment or dismissal (terminating sanctions)." *Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F.Supp.2d 456, 469 (S.D.N.Y. 2010) (citations omitted). Where there is evidence of egregious conduct on behalf of a defendant or her attorney in connection with spoliation of evidence, the striking of the defendant's answer may be an appropriate sanction. *R.F.M.A.S., Inc. v. So*, 606 F. Supp. 2d 497, 499, at n. 2 (S.D.N.Y. 2009). A party can also be awarded attorneys' fees incurred in connection with a successful motion for spoliation sanctions. *See*, e.g., *Novick v. AXA Network, LLC*, 2014 U.S. Dist. LEXIS 150004, at *22-23 (S.D.N.Y. 2014) (imposing sanctions in the form of an "adverse inference jury instruction concerning spoliated audio recordings [and] the award of the plaintiff's reasonable attorneys' fees and costs incurred in connection with the instant motion").

### A.  The Defendants Had An Obligation To Preserve The 911 Call

On January 15, 2014 it was reasonably foreseeable to the Defendants that the 911 call would be needed in the criminal proceeding stemming from the incident, and that civil litigation might arise from Mr. Thompson's arrest and prosecution.  For purposes of spoliation sanctions, the anticipated litigation need not even be the same litigation in which the spoliation sanctions are sought to provide notice of a duty to preserve evidence.  See, *Taylor v. City of N.Y.*, 293 F.R.D. 601, 610-11 (S.D.N.Y. 2013) ("…courts within  the Second Circuit have found that a duty to preserve relevant video footage may attach as soon as the triggering incident occurs and prior to when a claim is filed.) (collecting cases).  A police department and its constituent officers have an obligation to preserve evidence obtained during the course of its criminal investigations in anticipation of a criminal trial, and its failure to do so will justify the imposition of spoliation sanctions in a subsequent civil lawsuit which alleges police misconduct. *See Manganiello v. City of New York*, 612 F.3d 149, 166 (2d Cir. 2010) (in Plaintiff's civil lawsuit,

23

rejecting as "frivolous" the contention made by the defendant police detective that he had no

obligation to preserve the case file of a criminal investigation).  Here, there is the additional fact

that the officers did anticipate litigation as of the day of the arrest by calling for a legal opinion

on the appropriateness of the arrest immediately after the arrest.  (Deposition of Warren Bertram,

hereinafter Pl. Ex. K, p. 30 line 13 to p. 31 line 13)  Defendant Bertram testified he called an

attorney to ascertain the legality of the search of the apartment, after the search was concluded.

(Pl. Ex. K, p. 30 line 13 to p. 31 line 13). Law enforcement officer also can have a duty to seek to

preserve evidence where the evidence is in the hands of a private party, and a defendant law

enforcement officer was involved (as in the case at bar) at the scene of the incident between a

plaintiff and private-party defendants out of which the litigation stemmed. *See*, e.g., *DeMeo v.*

*Kean*,  754 F. Supp. 2d 435, 448-49 (N.D.N.Y.  2010) (citing to *Kronisch v. U.S.*, 150 F.3d 112,

126 (2d Cir. 1998) for the proposition that "while the obligation to preserve evidence most

commonly arises from express notice that a claim has been filed, it may also arise 'when a party

should have known that the evidence may be relevant to future litigation'," and noting that

"[t]his is particularly true in the case of Reyner as a law enforcement officer."); s*ee also*, *Taylor*

*v. City of New York*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013) (describing the New York City

Department of Corrections defendants' knowledge that litigation often arises stemming from

injuries caused to inmates, and noting that "[i]n analogous situations where a party has

knowledge that certain types of incidents tend to trigger litigation, courts within the Second

Circuit have found that a duty to preserve relevant video footage may attach as soon as the

triggering incident occurs and prior to when a claim is filed."). Accordingly, Defendants

reasonably foresaw the possibility of litigation and therefore had an obligation to preserve these

multiple items of evidence that might be relevant to that litigation.

24

B.  Defendants Acted With A Culpable State Of Mind When They Allowed The 911
Transcripts to Be Spoliated, And This Spoliated Evidence Was Relevant To
Plaintiff's <u>Claims And To Defendants' Defenses</u>

The Second Circuit has held that "the 'culpable state of mind' factor [for spoliation] is

satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to

[breach a duty to preserve it], or *negligently*.'" *Residential Funding Corp. v. DeGeorge*

*Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (brackets in original). Here the Defendants

have refused to produce or to account for the transcript in question.  Defendants have cited only

their belief that the request for production was "vague, ambiguous, confusing and assumes facts

not true or established." (Def. Response and Objections ¶29).(Exhibit L)

The parties have been deprived of a critical item of evidence, to wit a complete and

accurate record of the 911 call made on January 15, 2014, through Defendants' actions and

omissions. The relevance of this evidence to a critical issue in this case, to wit, whether the

actual contents of the call would have led a reasonable prudent person to believe that there was

an imminent danger as to justify the warrantless entry of Defendants into Plaintiff's home, is

obvious. Furthermore, a jury will be deprived of the opportunity to listen to the call and form

their own impression of the caller's reliability. Even if  the prejudice of the loss of the actual

911 transcripts not so plain, their relevance and the prejudice from their absence could be

presumed under the circumstances at bar. *See Casale v. Kelly*, 710 F. Supp. 2d 347, 365

(S.D.N.Y. 2010) (citing  *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99,

107 (2d Cir. 2002)) ("Relevance and prejudice may be presumed when the spoliating party

acted in bad faith or in a grossly negligent manner.").

C.  <u>Appropriate Sanctions</u>

Under the circumstances at bar striking the Defendants' answers is an appropriate

25

sanction. If the Court nevertheless is disinclined to strike the Defendants' answer, plaintiff at a minimum is entitled to an adverse inference instruction to the jury.  An appropriate instruction would be that the jury should - or at the very least may - presume that the spoliated evidence would have supported plaintiff's version of events, and that their absence should - or at the very least may - be deemed as evidence that the Defendants acted unreasonably and unlawfully when they entered Plaintiff's home without a warrant and without probable cause and falsely arrested him when he asserted his Fourth Amendment rights.

Lastly, an award of attorney's fees to Plaintiff in connection with the instant motion also would be appropriate. See e.g., *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 382 (S.D.N.Y. 2014) (awarding attorney's fees to plaintiff in connection with a successful motion for spoliation sanctions); *Taylor v. City of New York*, 293 F.R.D. 601, 616 (S.D.N.Y. 2013) ("The Court's imposition of spoliation sanctions warrants the award of reasonable attorney's fees and costs to Plaintiff for his efforts with respect to this motion. Such a monetary award is appropriate because it serves the remedial purpose of making Plaintiff whole for the costs he has incurred as a result of Defendants' spoliation."). Attorneys' fees may be awarded upon a finding a spoliation of evidence even when the underlying lawsuit against the spoliator is dismissed. *See,* e.g., *Sekisui Am. Corp. v. Hart*, 15 F. Supp. 3d 359, 382 (S.D.N.Y. 2014) (dismissing counterclaim against plaintiff but ordering plaintiff to pay attorneys' fees to defense counsel pertaining to defendant's spoliation motion).

## **CONCLUSION.**

As discussed above, Plaintiff is entitled to partial summary judgment on his claims of false arrest and the Fourth Amendment violation in the form of a warrantless entry.

Furthermore, Plaintiff is entitled to spoliation sanctions, including an adverse inference instruction, an award of attorney's fees in connection with the motion for spoliation sanctions. Viewing the facts and evidence in a light most favorable to the Defendants, plaintiff was falsely arrested after Defendants entered his home without a warrant, without exigent circumstances and without probable cause, in violation of the Fourth Amendment. Defendants have failed to demonstrate a dispute of material fact surrounding the circumstances of Defendants' warrantless entry to Plaintiff's apartment and Plaintiff's arrest. Plaintiff has proffered facts establishing Defendants' personal involvement and the officers personal involvement is not actually in dispute.

For the foregoing reasons, Plaintiff respectfully requests: (1) that this Court finds that Defendants' warrantless entry into Plaintiff's apartment and seizure of Plaintiff were unconstitutional and grant plaintiff summary judgment on these issue and such other relief as this Court deems appropriate; and (2) that this Court find that Defendants spoliated the actual 911 call in breach of a duty to preserve such evidence and in so doing have prejudiced the Plaintiff, and impose spoliation sanctions against Defendants including striking the Defendants' answer, an adverse inference instruction, an award of attorney's fees in connection with the motion for sanctions and any other relief as this Court may deem just and proper.

Dated: Brooklyn, New York
March 9, 2017

Respectfully Submitted,

**LAW OFFICE OF DAVID A. ZELMAN**

/S

_____

By: **David A. Zelman, Esq.**