UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LARRY THOMPSON,

Plaintiff,

– against –

Police Officer PAGIEL CLARK, Shield
#28742; Police Officer PAUL
MONTEFUSCO, Shield #10580; Police
Officer GERARD BOUWMANS, Shield #
2102; Police Officer PHILLIP ROMANO,
Shield #6295,

Defendants.

**AMENDED MEMORANDUM &
ORDER**

14-CV-7349

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 2 6 2018 ★

BROOKLYN OFFICE

**JACK B. WEINSTEIN, Senior District Judge:**

| Parties | Counsel |
|---|---|
| Larry Thompson | David Zelman<br>612 Eastern Parkway<br>Brooklyn, NY 11225 |
| Pagiel Clark<br>Paul Montefusco<br>Gerard Bouwmans<br>Phillip Romano | Kavin Thadani<br>New York City Law Department<br>100 Church Street<br>New York, NY 10007<br><br>Matthew Bridge<br>New York City Law Department<br>100 Church Street<br>New York, NY 10007 |

1



## Table of Contents

I.   Introduction ..................................................................................................... 3

   A.   Charges ......................................................................................................... 5

   B.   Motions for Summary Judgment ................................................................... 5

   C.   Trial ............................................................................................................... 5

II.  Facts .............................................................................................................. 6

III. Law ................................................................................................................ 8

   A.   Summary Judgment ....................................................................................... 8

   B.   Unlawful Entry of Home ............................................................................... 9

   C.   False Arrest ................................................................................................. 10

   D.   Malicious Prosecution ................................................................................. 10

   E.   Denial of Right to Fair Trial ....................................................................... 11

   F.   Spoliation .................................................................................................... 12

   G.   Personal Involvement ................................................................................. 12

   H.   Qualified Immunity ..................................................................................... 13

      i.    Application of Current Law ................................................................... 14

      ii.   Policy Justifications .............................................................................. 17

      iii.  Legal Precedent ..................................................................................... 19

      iv.   Future Reliance on Qualified Immunity ............................................... 21

IV.  Application of Law to Facts ........................................................................ 24

   A.   Unlawful Entry of a Home .......................................................................... 24

   B.   Unlawful Arrest ........................................................................................... 25

   C.   Malicious Prosecution ................................................................................. 26

   D.   Denial of Right to Fair Trial ....................................................................... 27

   E.   Spoliation .................................................................................................... 27

   F.   Officer Bertram's and Rodney's Personal Involvement ............................. 28

V.   Conclusion ................................................................................................... 28

I.   Introduction

What shall a "good citizen," or a "good police officer," do when the United States Constitution tells them one thing and their common sense another?

Plaintiff alleges he was beaten by New York City Police Department ("NYPD") officers when he refused them entry into his home without a warrant. Defendant police officers argue that a report of child abuse provided exigent circumstances allowing their warrantless entry.

Larry Thompson ("Thompson" or "Plaintiff") is a "good citizen." He is a veteran of the United States Navy. He works as a supervisor for the United States Postal Service. He lives with his wife and two children. His reputation in the community is good.

Plaintiff's claim presents the question: what should a "good citizen," who committed no crime, do when confronted by "good police" trying to force their way into his home without a warrant to investigate a child abuse allegation? As explained by professor Robert Capers, the Supreme Court instructs the "good citizen" to waive his or her constitutional right to avoid invasion:

> *the good citizen should not hesitate to open his bag, pocket, or home to the police, or to otherwise consent to a search.* Such consensual searches, after all, will aid the police in doing their work. It will also enhance the citizen's safety and the safety of those around him. And of course, while even good citizens have a privilege against self-incrimination, and while of course the burden of proof always remains with the government, good citizens, if wrongly accused of a crime, will immediately present themselves to the authorities to prove their innocence. And if in the unusual event a good citizen in fact commits a crime-- perhaps it was a malum prohibitum crime—the good citizen will go a step further and admit his wrongdoing and accept his punishment. And lastly, should the good citizen for some reason find it absolutely necessary to assert his rights, such as his right to an attorney, he will assert those rights unambiguously to distinguish himself from other citizens who lack "linguistic skills."

I. Bennett Capers, *Criminal Procedure and the Good Citizen*, 118 Colum. L. Rev. 653, 663–64 (2018) (internal citations omitted); *see also Miranda v. Arizona*, 384 U.S. 436, 477–78 (1966)

("It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement.").

From a strict constitutional view, however, an occupant has no obligation to answer or even open his door. He has the right to stay inside and remain silent.

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.

*Kentucky v. King*, 563 U.S. 452, 469–70 (2011).

Despite this instruction from the Court to protect the constitutional requirement of a warrant, failure to answer or open a door is often viewed by police, society, and sometimes courts, as a reason for suspicion, justifying a finding of exigency. Alexander C. Ellman, *The Emergency Aid Doctrine and 911 Hang-Ups: The Modern General Warrant*, 68 Vand. L. Rev. 919, 945 (2015) ("Officers now frequently refer to a homeowner's refusal to allow officers into the home as evidence that an emergency exists. Likewise, the police often cite an occupant's refusal to answer the door as evidence of an emergency.").

Here, defendants claim they were justified in breaking in by the exigency of an ongoing possible threat to a child's safety. *See Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003). Disputed issues of fact remain. A jury determination is necessary to answer the mixed question of fact and law: whether the officers were confronted by a need so urgent as to offset the constitutional mandate of a warrant to enter a home. *Payton v. New York*, 445 U.S. 573, 586 (1980).

4

Qualified immunity is denied. Its grant, in the instant case, would be inconsistent with the purpose of 42 U.S.C. § 1983. "[Section] 1983 was [created] to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). Courts should be encouraged and "allowed to play their historic role as the guardians of constitutional rights, not prohibited from doing so by a judiciary that elevates its concern for comity above the constitutional rights to which all persons are entitled." Stephen R. Reinhardt (late Judge of the Court of Appeals for the Ninth Circuit), *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113 Mich. L. Rev. 1219, 1253 (2015). The courts, police, and public, will benefit from a clarifying jury decision in this often replicated situation.

A. Charges

Plaintiff, in his amended civil complaint, alleges: (1) unlawful entry; (2) false arrest; (3) excessive force; (4) malicious prosecution; (5) denial of right to a fair trial; (6) failure to intervene; and (7) denial of medical treatment.

He has abandoned his claim of denial of medical treatment and all those against Officer Warren Rodney. He has not waived his claim of excessive force.

B. Motions for Summary Judgment

Plaintiff moves for summary judgment on claims for (1) unlawful entry and (2) false arrest. His motion is denied.

Defendants move for summary judgment on claims for: (1) unlawful entry; (2) false arrest; (3) malicious prosecution; (4) denial of right to a fair trial; and (5) all claims against defendant Bertram. Defendants' motion is granted only on the claims against Sergeant Bertram.

C. Trial

The following claims shall proceed to trial: (1) unlawful entry against Officers Bouwmans, Romano, Clark and Montefusco; (2) false arrest against Officers Bouwmans, Romano, Clark and Montefusco; (3) excessive force against Officers Bouwmans, Romano, Clark and Montefusco; (4) malicious prosecution against Officer Clark; (5) denial of a right to a fair trial against Officer Clark; and (6) failure to intervene against Officers Bouwmans, Romano, Clark and Montefusco.

II.     Facts

At about 10:00 p.m., on the night of January 15, 2014, Camille Watson ("Watson") called 911. Defendants' Rule 56.1 Statement, ECF No. 45-1, Jan. 20, 2017, at ¶ 1 ("Defs.' 56.1"); *see also* I/NetDispatcher—Event Chronology—D14011523758, Thadani Declaration, Ex. A, ("Sprint Report") at 1.  She reported that her two-week old niece was being abused by the baby's father at 399 Lincoln Place, Apartment 2E, in Brooklyn. *Id.*  Watson did not state that the abuse was currently occurring, only that she had seen red rashes on her niece's buttocks area. Plaintiff's Rule 56.1 Statement, ECF No. 54, Apr. 7, 2017, at ¶ 2 ("Pls.' 56.1"); Sprint Report at 1.  She identified the father as a 41 year-old black male, roughly five feet five inches tall, and 150 pounds.  Sprint Report at 1.

Thompson lived with his fiancé (now his wife), son, and one-week old daughter. Plaintiff's Motion for Summary Judgment, ECF No. 56, Apr. 7, ("Pls.' Summ. J.") Ex. B, Thompson Dep. 8:14-16.  Watson, his sister in law, suffered—and showed objective signs of— mental illness; she was temporarily living with plaintiff's family. *Id.* 15:10-22; *see also* Pls.' Summ. J., Ex. D, Watson Decl.

Two Emergency Medical Technicians ("EMTs") were directed to the scene by radio to investigate reported child abuse.  Pls.' Summ. J., Ex. D, Dillahunt Dep. 9:1-25.  They were met

6

by a female, later identified as Watson, who asked the EMTs to follow her "upstairs." *Id.* 13:10-20. Watson did not provide any further corroboration to the EMTs at the scene. *Id.* They thought Watson appeared "strange" that "she did not look like she was right in her mind" and that she may have had a "learning disability." *Id.* 17:3-11; Pls.' Summ. J., Ex. E, Marturano Dep. 15:1-13. They followed Watson into apartment 2E. *Id.* The EMTs were confronted and asked to leave by plaintiff Thompson. *Id.* 21:8-25. They left the building. *Id.* 22:8-10.

Police Officers Pagiel Clark, Paul Montefusco, Gerard Bouwmans, and Phillip Romano received a radio direction to respond to the scene and investigate a report of "possible child abuse." Pls.' Summ. J., Ex. F, Montefusco Dep. 19:21-25. The EMTs informed the arriving officers that they had a "report of a child being abused" and they needed to "check the baby out." Dillahunt Dep. 45:1-25.

Defendant officers knocked on the door of apartment 2E and Thompson answered. Pls.' Summ. J., Ex. B, Thompson Dep. 26:17-18. His fiancé was inside the apartment with their children. *Id.* 37:7-12. She was dressed "in her underwear and a t-shirt." *Id.* The officers told Thompson that they needed to enter the apartment. *Id.* 37:20-24. He responded "[n]ot without a search warrant. I don't agree to you[] coming in without one." *Id.* 38:11-13.

Officer Montefusco attempted to cross the threshold of the apartment. Montefusco Dep. 47:1-4. Thompson blocked his path, and the officers placed him under arrest. *Id.* Thompson alleges that he did not resist, but that Officer Monetufusco threw him to the floor and began to choke him, while the other officers kicked and punched him. Thompson Dep. 38:15-20. Defendants claim that he resisted arrest by "flail[ing] [his] arms preventing [the officers] from placing handcuffs on the defendant." *See* Pls.' Summ. J., Ex. A, Crim. Ct. Compl.

The officers entered the apartment along with the EMTs. Thompson Dep. 38:15-20. The EMTs observed red marks on the baby's buttocks but determined, after taking the child to a hospital, that these were caused by a diaper rash. Dillahunt Dep. 25:1-25. Thompson informed the officers that earlier that day he had taken his new born daughter to her first doctor's "appointment [since] being born." Thompson Dep. 17:4-16.

Thompson was transported in a police patrol car to the seventy-seventh precinct. *Id.* 61:7. He requested medical attention for back and neck pain, and was brought by the officers to Interfaith Hospital. *Id.* 66:21-67:17. An x-ray showed swelling, but no permanent injury. *Id.* 69:10-15. Pain medication and a neck brace were prescribed. *Id.* 69:16-25. He was returned by the police to the seventy-seventh precinct and then to Brooklyn Criminal Court. *Id.* 71-72.

Thompson was arraigned on January 17, 2014, on charges of NYPL § 195.05, Obstructing Governmental Administration in the Second Degree, and NYPL § 205.30, Resisting Arrest. *See* Pls.' Summ. J., Ex. A, Crim. Ct. Compl. He had been held in custody for two days. He was released on his own recognizance; after three court appearances, the case against him was dismissed on motion of the Brooklyn District Attorney. Thompson Dep. 73:13-19. Thompson was never charged with child abuse.

III.  Law

A. Summary Judgment

Summary judgment will be granted unless there exists disputed "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court is required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003).

B.  Unlawful Entry of Home

The Fourth Amendment protects the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. *Arizona v. Evans*, 514 U.S. 1 (1995).  Searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980).

One exception to the warrant requirement is the presence of exigent circumstances. *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1991).  The primary inquiry in determining whether exigent circumstances justify a warrantless entry is whether law enforcement agents are "confronted by an urgent need to render aid or take action." *Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003).  Police officers may enter a dwelling without a warrant to render emergency aid to a person whom they reasonably believe to be in distress and in need of assistance. *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (internal citation omitted).  They may do this if, based on the totality of the circumstances known to the investigating officers at the time of entry, it was "objectively reasonable" for them to do so.  *Id.*  "Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  The government carries a "heavy burden" in establishing the presence of this exception and rebutting the presumptive unreasonableness of a warrantless search. *See, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

In the context of possible child abuse, the state has a "profound interest in the welfare of the child, particularly in his or her being sheltered from abuse." *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991) (internal citation omitted).  The "mere possibility" of child abuse is insufficient

grounds for state intervention; law enforcement agents must have an objectively reasonable basis to believe that danger to the child is imminent. *Id.* at 81.

Anonymous or uncorroborated 911 calls cannot alone justify the warrantless entry of a home. *Kerman v. City of New York*, 261 F.3d 229, 238 (2d Cir. 2001).

### C. False Arrest

An arrest without probable cause constitutes a false arrest and thus a violation of the Fourth Amendment. *See Arizona v. Hicks*, 480 U.S. 321 (1987). "The test to be applied in determining whether probable cause existed for an arrest is whether the facts available to the officers at the moment of the arrest were sufficient to warrant a prudent [officer] in believing that the [defendant] had committed . . . an offense." *U.S. ex rel. LaBelle v. LaVallee*, 517 F.2d 750, 753 (2d Cir. 1975) (internal quotation omitted). In determining the validity of an arrest, the court looks to the applicable state law as it pertains to the offense at issue, in this case the law of the State of New York. *See Ker v. California*, 374 U.S. 23, 37 (1963).

### D. Malicious Prosecution

A plaintiff seeking to establish a claim for malicious prosecution must prove: (1) the initiation or continuation of a state criminal proceeding; (2) termination of the state criminal proceeding in plaintiff's favor; (3) lack of probable cause; (4) actual malice by the defendant; and (5) an independent deprivation of liberty. *See Murphy v. Lynn,* 118 F.3d 938, 944-47 (2d Cir. 1997).

If a plaintiff is required to appear or be held on other criminal charges supported by probable cause, and of equal or greater magnitude, a claim of malicious prosecution will not stand. *Coleman v. City of New York,* 688 Fed. Appx. 56, 58 (2d Cir. 2017); *see also Flynn-Rodriguez v. Cheng*, No. 14-CV-2287, 2017 WL 3278889, at *2 (E.D.N.Y. Aug. 1, 2017).

E. Denial of Right to Fair Trial

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors to aid prosecution, he or she violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). An individual suffers a constitutional violation of the Sixth Amendment's right to fair trial if: (1) an official; (2) fabricates evidence that; (3) is likely to influence a jury; (4) forwards that information to prosecutors knowing it is false; and (5) the plaintiff suffers a deprivation of liberty as a result. *See Jovanovic v. City of New York*, 486 Fed. App'x 149, 152 (2d Cir. 2012). A plaintiff is not required to proceed to trial in order to have an actionable § 1983 claim based on the denial of this right. *See Ricciuti*, 124 F.3d at 127. The claim may accrue when fabricated information is forwarded to a prosecutor and results in a deprivation of defendant's liberty. *Id.* at 130.

The falsified evidence need not be the sole or continous reason the plaintiff was deprived of liberty. *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) ("[E]ven though the arrest . . . was supported by probable cause, and therefore a privileged arrest accounted for at least some portion of the deprivation of his liberty, the [plaintiff] nevertheless . . . suffered a deprivation of liberty as a result of the officer's fabrication of a false confession."). The deprivation prong may be satisfied even if an officer had probable cause to make an arrest on another charge.

> The setting of bail, which may make the difference between freedom and confinement pending trial, and the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action, may depend on the prosecutor's and magistrate's assessments of the strength of the case, which in turn may be critically influenced by fabricated evidence. Thus, a further deprivation of

liberty can result from the fabrication of evidence even if the initial arrest is lawful.

*Garnett,* 838 F.3d at 277.

Qualified immunity is unavailable on "a claim for denial of the right of a fair trial where the claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find." *Morse v. Fusto,* 804 F.3d 538, 550 (2d Cir. 2015).

F. Spoliation

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999). A plaintiff seeking an adverse inference or other remedies for spoliation must prove: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir. 2002).

G. Personal Involvement

Personal involvement of a defendant "in [an] alleged constitutional deprivation[] is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation omitted). A supervisor's personal involvement may be shown through "evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4)

the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." *Id.*

## H. Qualified Immunity

Qualified immunity has recently come under attack as over-protective of police and at odds with the original purpose of section 1983: "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992); *see* Jon O. Newman, *Here's a Better Way to Punish the Police: Sue Them for Money*, Washington Post, Jun. 23, 2016.

The Court's expansion of immunity, specifically in excessive force cases, is particularly troubling. As stated by one frequent defender of constitutional rights:

> The Supreme Court's decision [in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018)] serves to expand qualified immunity for police officers to an unprecedented and dangerous degree, becoming, as Justice Sotomayor aptly noted in her dissent, 'an absolute shield for law enforcement officers' and 'gutting the deterrent effect of the Fourth Amendment.' As the nation continues to mourn the recent deaths of [citizens] at the hands of police, we remain concerned that this ruling will undermine efforts to hold law enforcement officers accountable for their use of excessive force, which has led to the tragic loss of too many innocent lives.

NAACP LDF, *Statement on U.S. Supreme Court Decision Expanding Qualified Immunity for Police*, Apr. 2, 2018.

The legal precedent and policy justifications of qualified immunity, it has been charged, fail to validate its expansive scope. The law, it is suggested, must return to a state where some effective remedy is available for serious infringement of constitutional rights. *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) ("This decision is not just wrong on the law; it also sends an alarming signal to law enforcement officers and the public. It tells . . . the public [and officers] that palpably unreasonable conduct will go unpunished.").

i.  Application of Current Law

Qualified immunity, as it stands, protects "all but the plainly incompetent." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation omitted).  Police officers are immune from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

This rule is grounded in the belief that officers should be protected from reasonable mistakes, but not allowed to act in clear violation of constitutional law.

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation omitted).

The doctrine, historically, provided no immunity to officers who intentionally subverted the law or acted with malicious intent. *See Harlow,* 457 U.S. at 815 ("[Q]ualified immunity would [traditionally] be defeated if an official . . . took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury.") (emphasis in original). *Harlow,* however, expanded immunity to any conduct that is not in violation of a "clearly established" law, regardless of whether the official acted in good or bad faith. *Id.* at 818.

The change in the law means that even officers who intentionally or maliciously flout the Fourth Amendment are immune from suit if their actions were "objectively reasonable." For example, in *Mullenix v. Luna*, 136 S. Ct. 305, 316 (2015), the Supreme Court granted qualified immunity to a state trooper who fired six rounds at a car that had led police on a chase and was traveling at 85 miles per hour. The shots killed the driver. *Id.* They were fired "less than a

second before the car hit spike strips deployed to stop it." *Id.* In a dissent, Justice Sotomayor discussed the Court's inability to examine the subjective intent of the officer:

> When Mullenix confronted his superior officer after the shooting, his first words were, "How's that for proactive?" (Mullenix was apparently referencing an earlier counseling session in which [his superior officer] suggested that he was not enterprising enough.). The glib comment does not impact our legal analysis; an officer's actual intentions are irrelevant to the Fourth Amendment's "objectively reasonable" inquiry. But the comment seems to me revealing of the culture this Court's decision supports when it calls it reasonable—or even reasonably reasonable—to use deadly force for no discernible gain and over a supervisor's express order to "stand by." By sanctioning a "shoot first, think later" approach to policing, the Court renders the protections of the Fourth Amendment hollow.

*Mullenix,* 136 S. Ct. at 316 (Sotomayor, J., dissenting) (internal citation omitted).

This evolution in the law has also affected the current procedure in which courts analyze constitutional claims. *Saucier v. Katz,* 533 U.S. 194 (2001) required district courts to first determine whether a constitutional violation had occurred, and if so, proceed to determine whether the law was "clearly established" at the time. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) rejected *Saucier*, allowing courts to grant qualified immunity without analyzing whether or not a constitutional violation had occurred, but solely on the finding that the right at issue was not "clearly established." If the law is not "clearly established," an officer's actions, the Court assumes, can only be reasonable.

This approach has led to decisions like *Mullenix*, where the Court declined to address the question of whether a plaintiff's constitutional rights were violated, but decided only if the right was "clearly established." 136 S. Ct. at 308 ("We address only the qualified immunity question, not whether there was a Fourth Amendment violation in the first place, and now reverse."). The majority in *Mullenix* relied solely on the finding that it was not "beyond debate" that the officer had acted unreasonably in shooting the fleeing suspect. *Id.* at 309. The constitutional question, was therefore irrelevant.

The failure to address whether or not an act was constitutional prevents the creation of "clearly established" law needed to guide law enforcement and courts on narrow issues not yet decided by the Supreme Court.

> [E]ven the most egregious official actions will further tempt courts to ignore important constitutional questions and, instead, to assume that the current Court will rarely, if ever, reverse a grant of qualified immunity. The failure to identify constitutional violations allows government officials and law enforcement officers to continue their unconstitutional practices secure in the knowledge that they cannot be called to account for their actions. While *Saucier* ensured that even when qualified immunity applied in a particular case, federal courts would provide remedies for victims of unconstitutional law enforcement practices in future cases, *Pearson* secures precisely the opposite end. At a time in which it is vital for constitutional law to keep pace with changes in technology, social norms, and political practices, this trend toward granting immunity while failing to articulate constitutional rights will surely have far-reaching, negative repercussions.

Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113 Mich. L. Rev. 1219, 1250 (2015); Lindsey de Stefan, *How Qualified Immunity Reform Could Create Accountability and Curb Widespread Police Misconduct*, 47 Seton Hall L. Rev. 543, 566 (2017) ("Some officers are escaping liability simply because of the Court's repeated failures to establish consistency and clarity in its qualified immunity jurisprudence . . . the Court [should] use[] qualified immunity opinions to demonstrate what qualifies as a clearly established right by meticulously outlining its reasoning in answering whether a set of facts implicates such a right."); *but cf. Simon v. City of New York*, No. 17-1281, 2018 WL 3059387, at *1 --- F.3d ---- (2d Cir. June 21, 2018) (denying qualified immunity in "an uncommon obvious case in which the unlawfulness of the defendants' conduct is sufficiently clear even though existing precedent does not address similar circumstances.") (internal quotation marks and alterations omitted).

### ii. Policy Justifications

The Supreme Court's policy justifications for qualified immunity have evolved over time. Consistently lurking in the background is the threat of financial cost to government officials. This was first explicitly cited in *Pierson v. Ray*, 386 U.S. 547, 555 (1967). The Court granted qualified immunity to police officers in the belief that if it was not granted police might be disinclined to perform their duty. "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." *Id.* This concern is misdirected when focused on individual police officers because they are "virtually always indemnified." Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885 (2014) ("Governments paid approximately 99.98% of the dollars that plaintiffs recovered in lawsuits alleging civil rights violations by law enforcement. Law enforcement officers in my study never satisfied a punitive damages award entered against them."); *see also* Lynn Adelman, *The Supreme Court's Quiet Assault on Civil Rights*, Dissent Magazine, Fall 2017 (thoroughly analyzing the Supreme Court's policy justifications for qualified immunity).

After *Pierson*, the Court explained that the policy justifications of qualified immunity were not limited solely to damages against individual officers, but included broader "social costs," such as:

> the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.

*Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (internal citation omitted). The Court partly relied on the burden of "unnecessary litigation" to encourage district courts to skip the

constitutional question and decide only whether a right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("Unnecessary litigation of constitutional issues also wastes the parties' resources. Qualified immunity is an immunity from suit rather than a mere defense to liability. *Saucier*'s two-step protocol disserve[s] the purpose of qualified immunity when it forces the parties to endure additional burdens of suit—such as the costs of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily.") (internal citation omitted).

Citing qualified immunity as a remedy for social costs and the burdens of litigation may, some academics believe, be misguided. As Professor Schwartz puts the matter:

> [Q]ualified immunity may actually increase the costs and delays associated with Section 1983 litigation. Although qualified immunity terminated only 3.9% of the 979 cases in my dataset in which qualified immunity could be raised, the defense was in fact raised by defendants in more than 37% of these cases--and was sometimes raised multiple times, at the motion to dismiss stage, at summary judgment, and through interlocutory appeals. *Each time qualified immunity is raised, it must be researched, briefed, and argued by the parties and decided by the judge.* And litigating qualified immunity is no small feat. John Jeffries describes qualified immunity doctrine as "a mare's nest of complexity and confusion." Lower courts are "hopelessly conflicted both within and among themselves" as a result. One circuit court judge reported that "[w]ading through the doctrine of qualified immunity is one of the most morally and conceptually challenging tasks federal appellate court judges routinely face."
>
> The time and effort necessary to resolve qualified immunity motions could nevertheless further the goals of qualified immunity doctrine if it effectively protected defendants from discovery and trial. But in the five districts in my study, just 8.6% of qualified immunity motions brought by defendants in my docket dataset resulted in case dismissals. The remaining 91.4% of qualified immunity motions brought by defendants required the parties and judges to dedicate time and resources to briefing, arguing, and deciding the motions without shielding defendants from discovery and trial.

Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 60–61 (2017) (emphasis added). In the cases where qualified immunity was granted, it was most often done at the

summary judgment stage, meaning that it still failed to "shield government officials" because of the extensive fact discovery required to litigate a motion for summary judgment. *Id.* at 49.

Qualified immunity may be motivated by a greater desire to generally prevent lawsuits against public officials, or to shield governments themselves from costs, but the Supreme Court has never openly expressed this rationale. *Id.* at 50 ("Available evidence suggests that just 1% of people who believe they have been harmed by the police file lawsuits against law enforcement."); *see also* Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity,* 113 Mich. L. Rev. 1219, 1245–46 (2015) ("As law enforcement officers benefit from qualified immunity, so do municipalities, indirectly, because indemnification agreements would otherwise force them to pay the damages for which the officers have been held responsible; in fact, when officers receive the benefit of qualified immunity, it is in reality the municipality that is relieved of its duty to compensate the victim of a constitutional violation.").

### iii. Legal Precedent

The legal precedent for qualified immunity, or its lack, is the subject of intense scrutiny. *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("As I have observed earlier, our treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume.").

Six years after *Monroe v. Pape*, 365 U.S. 167 (1961) expanded the protections of 42 U.S.C. § 1983, the Court began narrowing its influence through imposition of qualified immunity by way of a common law good faith defense. In *Pierson v. Ray*, 386 U.S. 547, 557 (1967), the Court ruled "that the defense of good faith and probable cause, which the Court of

Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under [§] 1983." One criticism of this application is that the common law did not allow for a general good faith defense. It only applied if embedded in specific elements of intentional torts. *See Myers v. Anderson*, 238 U.S. 368, 378–79 (1915) (rejecting a good faith defense in a section 1983 case claiming discrimination in voting); *see also Wyatt v. Cole*, 504 U.S. 158, 172 (1992) ("[I]t is something of a misnomer to describe the common law as creating a good-faith *defense;* we are in fact concerned with the essence of the wrong itself, with the essential elements of the tort.").

As professor William Baude has explained, the lack of a "freestanding" common law good faith or immunity defense is significant, because:

> an element of a specific tort does not provide evidence of a more general backdrop that one would expect to export to other claims, let alone from common law to constitutional claims. For instance, a Fourteenth Amendment antidiscrimination claim requires the plaintiff to demonstrate discriminatory intent by the defendant. But it does not follow that intent—let alone discriminatory intent—is an element of a due process claim. Similarly, bad faith and flagrancy were simply elements of certain torts brought against public officials. It did not follow that they were elements of all torts or all constitutional claims against public officials.

William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 59 (2018).

Common law origin has remained a key justification of qualified immunity, even as the standard for official immunity has changed from good faith to objective reasonableness. *See Anderson v. Creighton*, 483 U.S. 635, 645 (1987) ("[In *Harlow*] the Court completely reformulated qualified immunity along principles not at all embodied in the common law, replacing the inquiry into subjective malice so frequently required at common law with an objective inquiry into the legal reasonableness of the official action."). Although the Court is no longer constrained by a common law good faith defense, it continues to rely on the common law as precedent for granting immunity. Ilan Wurman, *Qualified Immunity and Statutory*

*Interpretation*, 37 Seattle U. L. Rev. 939, 965 (2014). The shifting paradigm, unexplained by historical or legal precedent, has led some to argue that the Court has strayed from its assertion in *Tower v. Glover*, 467 U.S. 914, 922-23 (1984) that it does "not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy."

Justice Scalia, fully dismissing common law precedent, opined that the Court had no duty to rely on legal justifications for qualified immunity, but should in fact pare it down, because, for policy reasons, he believed *Monroe v. Pape* improperly expanded section 1983:

> *Monroe* changed a statute that had generated only 21 cases in the first 50 years of its existence into one that pours into the federal courts tens of thousands of suits each year, and engages this Court in a losing struggle to prevent the Constitution from degenerating into a general tort law . . . Applying normal common-law rules to the statute that *Monroe* created would carry us further and further from what any sane Congress could have enacted.

> We find ourselves engaged, therefore, in the essentially legislative activity of crafting a sensible scheme of qualified immunities for the statute we have invented—rather than applying the common law embodied in the statute that Congress wrote.

*Crawford-El v. Britton*, 523 U.S. 574, 611 (1998).

### iv. Future Reliance on Qualified Immunity

The Supreme Court's recent emphasis on shielding public officials and federal and local law enforcement means many individuals who suffer a constitutional deprivation will have no redress; state governments are protected by sovereign immunity and municipalities are not liable under *Monell* unless individual liability can be first proven. *See, e.g., Cordero v. City of New York*, 282 F. Supp. 3d 549, 557 (E.D.N.Y. 2017) ("The first phase will be against the officer defendants, the second phase on the *Monell* issue will only need to go forward if the jury finds against the individual defendants in the first phase.").

Courts should, when reasonable, follow *Saucier's* guidance to first analyze whether a constitutional violation occurred, instead of skipping to whether the right at issue was "clearly

established." The failure to first address the constitutional question is an avoidance of the court's "essential function of explaining and securing the protections of the Constitution by failing to inform law enforcement officers, among others, which practices are constitutional and which are not." Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113 Mich. L. Rev. 1219, 1249 (2015); Michael Silverstein, *Rebalancing Harlow: A New Approach to Qualified Immunity in the Fourth Amendment*, 68 Case W. Res. L. Rev. 495, 522 (2017) ("Now, free from *Saucier*, overworked judges may want to take the "short route" instead of dealing with the merits of a case. This creates future costs. Judges constantly taking the easy way out in one area of the law creates a situation where 'civil rights questions go repeatedly unanswered.' This becomes a cycle where a constitutional violation need not be answered 'because the law is unclear and the law is unclear because the violation continues to go unaddressed.'") (internal citations omitted).

Turning to the application of qualified immunity, courts should, it has been suggested, return to the standard expressed in *Hope v. Pelzer*, 536 U.S. 730 (2002), and define "clearly established law" at a "high level of generality." The key inquiry being whether officers are on "notice their conduct is lawful." *Hope,* 536 U.S. at 730 (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). This allows courts to recognize "obvious" constitutional violations, even if not yet specifically outlawed in a prior Supreme Court ruling. Such a standard is vital in a rapidly changing society, where any willing judge or jurist may distinguish precedent as not "clearly established" because of slightly differing facts.

In *Hope*, 536 at 735, the Eleventh Circuit Court of Appeals affirmed a district court ruling granting qualified immunity for guards who had handcuffed an incarcerated plaintiff to a "hitching post" for a "7-hour period, [in which] he was given water only once or twice and was

given no bathroom breaks." The district court bypassed the constitutional question and found the established law was unclear entitling the guards to immunity. *Id.* The Circuit Court found an Eight Amendment violation but affirmed the district court, ruling:

> the federal law by which the government official's conduct should be evaluated must be preexisting, obvious and mandatory, and established, not by abstractions, but by cases that are materially similar to the facts in the case in front of us.

*Id.* at 736 (internal citation omitted).

The Supreme Court overruled the Eleventh Circuit finding the officers had fair warning, even in this *"novel circumstance"* that their treatment of the plaintiff was unconstitutional. *Id.* at 741 (emphasis added). This conclusion justly balanced the need to redress constitutional wrongs and shield officers when they act reasonably. The Court in *Hope* relied on case precedent and reports from the DOJ specifically advising against use of the hitching post:

> The obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment. Hope was treated in a way antithetical to human dignity—he was hitched to a post for an extended period of time in a position that was painful, and under circumstances that were both degrading and dangerous. This wanton treatment was not done of necessity, but as punishment for prior conduct. Even if there might once have been a question regarding the constitutionality of this practice, the Eleventh Circuit precedent of *Gates* and *Ort,* as well as the DOJ report condemning the practice, put a reasonable officer on notice that the use of the hitching post under the circumstances alleged by Hope was unlawful. The "fair and clear warning," that these cases provided was sufficient to preclude the defense of qualified immunity at the summary judgment stage.

*Id.* 745–46 (internal citations omitted).

As explained by the late Judge Stephen Reinhardt of the United States Court of Appeals for the Ninth Circuit, the *Hope* standard of providing notice of "clearly established" law at a "high level of generality" was short-lived:

> The most drastic change . . . in the Court's articulation of the qualified immunity standard came in *Ashcroft v. al-Kidd.* As Dean Erwin Chemerinsky has noted,

prior to *al-Kidd* the standard had always "focused on whether it was clearly established law that 'a' reasonable officer should know" that the action at issue violated federal law . . . [Justice Scalia] inserted the word "every" in place of the word "a," so that the new rule of law became that a right is clearly established when "'[t]he contours of [a] right [are] sufficiently clear' that *every* 'reasonable official would have understood that what he is doing violates that right.'" The Court also added in that case that for law to be clearly established, "existing precedent must have placed the statutory or constitutional question *beyond debate*." In sum, the Court explained that when its new qualified immunity standard is "properly applied, it protects 'all but the *plainly incompetent* or those who knowingly violate the law.'"

Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113

Mich. L. Rev. 1219, 1247–48 (2015) (internal citations omitted).

If courts, as instructed in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), decline to

address constitutional issues by looking first to qualified immunity, and are instructed to rely on

"existing precedent . . . [established] beyond debate," government officials and officers may

continue to operate in clear violation of constitutional standards without advise of what is

constitutional and without fear of redress, because the law will continue to protect "all but the

plainly incompetent." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

IV.    Application of Law to Facts

A.   Unlawful Entry of a Home

A jury will decide whether the officers' warrantless entry of plaintiff's home was

justified by exigency.

Officers responded to the scene to investigate a report of child abuse. They were

informed by EMTs that the 911 caller, who they believed might be intellectually challenged, had

met them outside, and taken them into the apartment. The caller did not state that the abuse was

ongoing; only that she had seen red marks on the baby.

Defendants requested entry to the apartment to investigate the alleged abuse. Plaintiff, who officers believed was the alleged perpetrator of child abuse, demanded that police produce a warrant to enter his home. This was plaintiff's constitutional right. *See Kentucky v. King*, 563 U.S. 452, 469–70 (2011). Police entry, however, may have been justified by the need to prevent ongoing harm to the baby or provide immediate aid before a warrant could be obtained. *See, e.g., Brigham City, Utah v. Stuart*, 547 U.S. 398, 406 (2006) (finding entry to a home was justified by exigency where officers responded to a loud house party at three a.m. and observed through a window a fight in the kitchen that had drawn blood); *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) ("It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here. Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances. But [t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.") (internal citation omitted).

The court declines to apply qualified immunity. Case precedent and policy rationale fail to justify an expansive regime of immunity that would prevent plaintiff from proving a serious constitutional violation. *See* Michael Silverstein, *Rebalancing Harlow: A New Approach to Qualified Immunity in the Fourth Amendment*, 68 Case W. Res. L. Rev. 495, 522 (2017) ("The less clear the law is, the more beneficial it might be to allow the case to proceed to trial and resolve the case on the merits.").

B. Unlawful Arrest

The probable cause to arrest Thompson for obstructing governmental administration rests on whether defendants had lawful reason to enter his apartment. This claim raises an issue of material fact that will be resolved at trial.

New York Penal Law Section 195.05 states:

A person is guilty of obstructing governmental administration when he intentionally obstructs, *impairs or perverts the administration of law or other governmental function* or *prevents or attempts to prevent a public servant from performing an official function,* by means of intimidation, *physical force* or interference, or by means of any independently unlawful act, or by means of interfering . . .

NYPL 195.05 (emphasis added).

Officers must be engaged in lawful conduct to arrest a defendant for obstruction. *People v. Sumter,* 151 A.D.3d 556, 557 (N.Y. App. Div. 2017) ("[A] defendant may not be convicted of obstructing governmental administration or interfering with an officer in the performance of an official function unless it is established that the police were engaged in authorized conduct."). If they were not lawfully able to enter the home, then plaintiff committed no crime by obstructing their path. *See Lennon*, 66 F.3d 416, 424 (2d Cir. 1995) (finding probable cause to arrest a woman for obstructing governmental administration who refused to comply with a lawful police order to exit her vehicle). If the obstruction arrest lacked probable cause, then the resisting arrest charge was also improper. *People v. Alejandro*, 70 N.Y.2d 133, 135 (1987) ("It is an essential element of the crime of resisting arrest that the arrest be authorized and, absent proof that the arresting officer had a warrant or probable cause to arrest defendant for commission of some offense, a conviction cannot stand.").

C. Malicious Prosecution

Plaintiff's claim for malicious prosecution shall proceed against Officer Clark. *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[F]iling of the Criminal Court Complaint 'initiate[s]' the prosecution."). Probable cause is at issue for both criminal charges. *Wilson v. McMullen*, No. 07-CV-948 SLT LB, 2010 WL 1268055, at *6 (E.D.N.Y. Mar. 30, 2010) (finding malice may be inferred from a lack of probable cause). Plaintiff was deprived of his

liberty when he was held in jail for two days and then required to make several court appearances before his case was dismissed. *Evans v. City of New York*, No. 12-CV-5341 MKB, 2015 WL 1345374, at *6 (E.D.N.Y. Mar. 25, 2015) ("[C]ourts have found the deprivation of liberty element satisfied particularly where a criminal defendant was required to attend several post-arraignment court appearances, and/or where, as in New York, a defendant's release on his own recognizance requires the defendant to 'render himself at all times amenable to the orders and processes of the court.'") (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215-16 (2d Cir. 2000)).

### D. Denial of Right to Fair Trial

Defendants claim plaintiff resisted when officers attempted to place him under arrest for obstruction of governmental administration. Plaintiff argues that defendants fabricated evidence when they informed the District Attorney that he "began to flail" his arms "preventing the [officer] from placing handcuffs on the [plaintiff]." *See* Pls.' Summ. J., Ex. A, Crim. Ct. Compl.

The allegation that plaintiff flailed his arms preventing arrest was forwarded to the prosecutor by Officer Clark, placed in the criminal court complaint, used as the basis for charging him with resisting arrest, and served to deprive him of his liberty. Veracity assessment by the jury will decide this issue.

### E. Spoliation

Plaintiff's spoliation claim is denied. He argues it was reasonably foreseeable that civil litigation would arise from this prosecution and that the police department had an obligation to preserve the 911 call.

This may be true if there was evidence that the officers had actually heard the 911 call. They did not. The officers testified that they received only a "radio run" from an NYPD

dispatcher. The "radio run" is a description of the 911 call given from a dispatcher, not the 911 call, or a transcript of the call itself. Because the defendants never actually heard the 911 call it is not relevant to their state of mind at the time they approached the apartment. What may be decisive evidence is the I/Net Dispatcher Event Chronology ("Sprint Report") which was produced to plaintiff in discovery.

F. Officer Bertram's and Rodney's Personal Involvement

Plaintiffs does not contest Officer Rodney's non-involvement. He is dismissed from the case.

Sergeant Bertram is also dismissed. Bertram arrived at the scene after plaintiff was in custody and never entered the apartment building. Defs.' 56.1 at ¶ 24. Bertram, while unsure if the arrest was constitutional, called the NYPD legal bureau, and spoke to an attorney who confirmed that the arrest was proper. *See* Pls.' Summ. J., Ex. K, Bertram Dep. 33:12-35:4. He was not present when the alleged excessive force was used. *Id.* He had no reason to believe the arrest was unconstitutional.

V.  Conclusion

Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted in part.

Based upon observations of all parties at summary judgment proceedings, race was not an explicit factor in this controversy.

Trial shall be held on December 10, 2018, in courtroom 10B South at 2:00 p.m. A jury will be selected that morning by a magistrate judge. An *in limine* hearing will be held on December 3, 2018, at 10:30 a.m. The parties shall exchange and file with the court by November 26, 2018, the following: (1) motions *in limine*; (2) lists of pre-marked exhibits

proposed for use at the trial, together with copies of the exhibits and stipulations regarding admissibility and authenticity; (3) lists of proposed witnesses together with brief summaries of their proposed testimony; and (4) stipulations with respect to undisputed facts.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: June 26, 2018
Brooklyn, New York