**LAW OFFICE OF DAVID A. ZELMAN**
709 Eastern Parkway
Brooklyn, New York 11213
(718) 604-3072
Fax (718) 604-3074

January 21, 2019

**VIA ECF**
**Honorable Jack B. Weinstein**
**United States District Court**
**EDNY, Brooklyn Courthouse**
**225 Cadman Plaza East**
**Brooklyn, NY 11201**

**Re: Larry Thompson v. The City of New York et. al.**
**Civil Action No. 14-cv-7349**

Your Honor:

I am the attorney for the plaintiff.  I write to submit a trial memorandum as to several issues which I believe the Court will likely see the need to address during the trial or at the jury instruction stage.

<u>False Arrest: Fellow Officer Rule</u>

In the proposed jury charge, the defendants propose and the Court appears to adopt the a charge entitled the "Fellow Officer Rule."  The Fellow Officer Rule or the Collective Knowledge Doctrine is "…exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986).  (*United States v Colon*, 250 F3d 130, 135 [2d Cir 2001].)

In *Thompson*, the rule has no applicability.  Here, all of the responding police officer/defendants were in possession of the same information and acted together.  They were not relying on information from any fellow officers to form the basis of probable cause.  As explained in *Colon*, the doctrine is not appropriately applied to non police entities. In Colon, the Circuit discussed how the doctrine was appropriately applied to auxiliary officers as they underwent extensive police training. The *Colon* court, however, then rejected the Government's argument that knowledge of the 911 operator should be imputed to the arresting officer pursuant to the Fellow Officer Rule:

> In contrast, the record here contains no evidence of whether or how 911 operator training is directed in any way to developing that ability, and thus contains nothing from which to conclude that the operator taking the call was capable of determining whether reasonable suspicion for the stop and frisk existed. The government has pointed to no cases imputing the knowledge of a person with no apparent training in assessing probable cause or

reasonable suspicion to an arresting officer, and the Court's research reveals none. In the absence of any showing that any NYPD employee with the training, responsibility or authority to make a determination of reasonable suspicion ever had sufficient information on which to effect or instigate the stop and search of Colon, this Court cannot find that the *Terry* stop was reasonable.

(*United States v Colon*, 250 F3d 130, 137 [2d Cir 2001].)

In *Thompson*, the only applicability that the Fellow Officer Rule could have is that the knowledge of the Emergency Medical Technicians had should be imputed to the officers. The EMT's had met with the 911 caller prior to the officers' forced entry into the apartment, whereas the officers had not. However, the EMT's knowledge gained from meeting with the 911 caller can not be imputed to the officers for two reasons. First, the 911 caller, according to the EMT's refused to speak to them when they arrived at the apartment. Therefore, there was nothing gleaned from meeting with her at all. Secondly, the EMT's have no training in whether probable cause or reasonable suspicion standards have been met and therefore, similar to the 911 operator analysis, the EMT's knowledge can not be imputed to the officers. (*United States v Colon*, 250 F3d 130, 137 [2d Cir 2001].) Therefore, the doctrine should not be charged to the jury or used at trial as it has no applicability to this matter and would only serve to confuse the jury.

False Arrest: Uncharged Offenses

Defendant propose and the Court appears to have agreed that the jury will be charged with two uncharged offenses, namely, Obstructing Emergency Technicians and Child Endangerment. Because probable cause for both of these uncharged offenses was lacking at the time of the arrest, neither can support probable cause and neither should be charged to the jury.

The plaintiff was charged in the underlying criminal matter with Obstruction Of Government Administration in the Second degree. Defendants propose that the jury also be charged with Obstruction of Emergency Medical Technicians, apparently, due to the conversation which Thompson had with the EMT's before the officers arrived. The EMT's testified that Thompson asked them to leave his apartment after discussing other apartments where the EMT's might find children as the EMT's indicated that they were responding to a call about a child. Thompson, at the time, had no idea who had called the EMT's and the EMT's further confused the matter by admitted that they informed Mr. Thompson that they thought they had the wrong apartment. The EMT's felt that Mr. Thompson was "aggressive" inside his own apartment, but there was no allegation of any touching, blocking, or any physical act. This is apparently the reason that when the EMT's were deposed, they did not mention that they felt that Mr. Thompson had committed a crime in how they interacted with him before the police arrived. Nor did any of the officers at deposition ever mention how Mr. Thompson interacted with the EMT's was suspicious of a crime. But even if they had, it is readily apparent that the interaction Mr. Thompson had with the EMT's prior to the officers' arrival could not have been obstruction of emergency medical technicians because there was no allegation of any physical act which is a the bedrock of an obstruction charge. What a person says, or how it is said, is not obstruction of governmental administration. See, (*McKnight v Vasile*, 2017 US Dist LEXIS 47970, at *47-48 [WDNY Mar. 30, 2017, No. 11-CV-6328P].):

New York courts have repeatedly held that the word "physical" in the statute modifies the words "force" *and* "interference." *See Dowling v. City of New York*, 2013 U.S. Dist. LEXIS 142108, 2013 WL 5502867, *5 (E.D.N.Y. 2013) (internal citations omitted); *see Rasin v. City of New York*, 2016 U.S. Dist. LEXIS 59650, 2016 WL 2596038, *5 (E.D.N.Y. 2016) ("[i]n addition to intent and actual or attempted obstruction or impairment of a government function, a violation of the statute requires physical [*48] interference"); *Trapp-Miley v. City of New York*, 2012 U.S. Dist. LEXIS 44241, 2012 WL 1068102, *6 (E.D.N.Y.) ("recent caselaw makes clear that some physical aspect to the interference — albeit not necessarily physical *force* — must be present to constitute a violation of section 195.05"), *report and recommendation adopted as modified*, 2012 U.S. Dist. LEXIS 44243, 2012 WL 1068084 (E.D.N.Y. 2012). In other words, to constitute obstruction under the statute, the interference must contain a physical component; "verbal interference" alone is insufficient. *In re Davan L.*, 91 N.Y.2d 88, 91, 689 N.E.2d 909, 666 N.Y.S.2d 1015 (1997); *see Hilderbrandt v. City of New York*, 2014 U.S. Dist. LEXIS 128170, 2014 WL 4536736, *4 (E.D.N.Y. 2014) (*HN6* "words alone, even abusive ones, cannot give rise to probable cause to arrest for obstructing governmental administration as a matter of law") (internal citations omitted); *Dowling v. City of New York*, 2013 U.S. Dist. LEXIS 142108, 2013 WL 5502867 at *4 (*HN7* "[f]ailing to obey a police order, in and of itself, does not constitute a circumstance that gives rise to probable cause for an arrest for obstructing government administration"); *Richardson v. N.Y.C. Health & Hosps. Corp.*, 2009 U.S. Dist. LEXIS 25247, 2009 WL 804096, *9 (S.D.N.Y. 2009).

There is an additional issue with charging obstruction of emergency medical technicians as an uncharged offense as any obstruction charge, to be valid, must rest upon an 'authorized act' of the police. If the underlying action taken by police is not "authorized" there can be no obstruction.

[A] defendant may not be convicted of obstructing governmental administration or interfering with an officer in the performance of an official function unless it is established that the police were engaged in authorized conduct" (*People v Lupinacci*, 191 AD2d 589, 590, 595 N.Y.S.2d 76 [2d Dept 1993]; *see People v Greene*, 221 AD2d 559, 560, 634 N.Y.S.2d 144 [2d Dept 1995]; CJI2d [NY] Penal Law § 195.05 ["the official function the defendant is charged with having prevented or attempted to prevent a public servant from performing must have been authorized"]). Where, as here, the official function performed by the officer is an arrest, an information is jurisdictionally defective if it fails to allege facts showing that the arrest was authorized (*see e.g. Matter of Anthony B.*, 201 AD2d 725, 726, 608 N.Y.S.2d 302 [2d Dept 1994]; *Matter of Verna C.*, 143 AD2d 94, 95, 531 N.Y.S.2d 344 [2d Dept 1988]; *see also* William C. Donnino, Practice Commentary, McKinney's Cons Laws of NY, Penal Law § 195.05 ["An official function' in the context of an arrest requires that the arrest be lawful"])

Here, the issue of whether the EMT's activity in entering the plaintiff's apartment was "authorized" is simply not at issue in the case sufficiently to create "phantom" probable cause that plaintiff interfered with the EMT's sufficiently to be guilty of obstruction. The EMT's did not insist on going into the apartment, they were initially allowed in by Ms. Watson. When they

met Mr. Thompson, they explained they received an anonymous call regarding a child. Mr. Thompson indicated that there was no caller regarding his apartment and offered other apartments in the building where children live. The officers agreed to leave and left explaining to Mr. Thompson that they thought that they had the wrong apartment. There can be no obstruction in this conversation because there was no "authorized" activity alleged. The EMT's agreed to leave without even as much as an argument. Without an allegation of "authorized" activity, there can be no probable cause for obstruction and this offense is not properly charged to the jury in this case.

The offense of child endangerment is not properly presented to the jury as an uncharged offense. There simply was no evidence of child endangerment at any stage of this case. The 911 operator noted "possible child abuse" following the operator's discussion with the anonymous caller, Ms. Watson. There was no evidence or testimony that anyone witnessed child abuse. The EMT's both testified that they were dispatched to the premises to examine the situation and see what, if anything, was occurring at the plaintiff's apartment. The police certainly never had "probable cause" to believe that child endangerment was occurring as there was simply no evidence of that other than the uncorroborated report of the 911 caller which itself did not allege probable cause. As soon as the baby was examined, at the apartment, the EMT's testified that they were immediately aware that there was no abuse of the baby occurring. By offering the jury the possibility that the police had probable cause to believe that plaintiff was endangering the welfare of a minor is inviting the jury to speculate in the absence of evidence.

### Malicious Prosecution

The issue of initiation of the criminal matter by the defendants is not properly put to the jury in this case. Here, the criminal matter was initiated by defendant Clark as he signed the criminal court complaint. New York Courts have routinely held that signing the criminal court complaint is sufficient to remove the issue of initiation of the criminal matter from the jury's consideration. See, *Quezada v Bakraqi*, 2017 US Dist LEXIS 145090, at *26-27 [SDNY Sep. 7, 2017, No. 15-CV-10105 (VEC) (BCM)].) ("While police officers do not generally 'commence or continue' criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution.'" *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quoting *Manganiello*, 612 F.3d at 163). An officer plays an "active role in the proceedings" where he "giv[es] advice and encouragement or importun[es] the authorities to act," *Manganiello*, 612 F.3d at 163, or where he signs the criminal complaint that initiates the prosecution or provides the information set forth therein. *See, e.g., Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("As a matter of law, [officers] Ramos and Rivera's filing of the Criminal Court Complaint 'initiated' the prosecution against Cameron."); *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (noting that an officer plays an active role by "having the plaintiff arraigned," completing "complaining and corroborating affidavits," and "signing felony complaints") (internal quotation marks omitted); *Williams v. City of New York*, 2012 U.S. Dist. LEXIS 21729, 2012 WL 547508, at *6 (S.D.N.Y. Feb. 17, 2012) (plaintiff satisfied first element of malicious prosecution [*27] claim as to police officer who "signed a criminal complaint that led to Plaintiff[']s eventual indictment"); *Sankar v. City of New York*, 2012 U.S. Dist. LEXIS 99975, 2012 WL 2923236, at *9 (E.D.N.Y. July 18, 2012) ("[A]n officer's filing of a sworn

complaint is sufficient to satisfy the initiation prong of a malicious prosecution claim.").

This Court in its summary judgment decision, page 26, cited *Cameron v City of NY*, 598 F3d 50, 63 [2d Cir 2010]. ("Plaintiff's claim for malicious prosecution shall proceed against Officer Clark. *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[F]iling of the Criminal Court Complaint 'initiate[s]' the prosecution.") The Circuit in Cameron held ("As the District Court correctly instructed the jury, there was no dispute in this case as to the existence of the first and fourth prongs of Cameron's malicious prosecution claim. As a matter of law, Ramos and Rivera's filing of the Criminal Court Complaint "initiated" the prosecution against Cameron.") This is the exact situation in *Thompson*.

It is plaintiff's position that the jury instructions in this case make plain that the probable cause for the false arrest claim and the probable cause for the malicious prosecution claim are not the same. As was held in *Mejia v City of NY*, 119 F Supp 2d 232, 254 [EDNY 2000]:

> Finally, the existence, or lack, of probable cause is measured at a different point in time in a malicious prosecution action than a false arrest action, where the prosecution follows a warrantless arrest. This is because a warrantless arrest is an extrajudicial proceeding. *See id.* at 458, 373 N.Y.S.2d at 94. In such cases, the judicial proceeding is not deemed to have been commenced until the plaintiff's arraignment or an indictment by a grand jury. *See id.* at 457, 373 N.Y.S.2d at 94. Accordingly, the existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest. *See* 59 N.Y. Jur. 2d *False Imprisonment & Malicious Prosecution* § 73 (1987) ("Whether probable cause existed depends upon whether a reasonably prudent person would have believed the plaintiff guilty of the crime charged on the basis of the facts known to the defendant *at the time the prosecution was initiated* or which he then reasonably believed to be true." (emphasis added)). Thus, information discovered by a malicious prosecution defendant after the arrest, but before the commencement of proceedings, is relevant to the determination of probable cause in cases where the prosecution follows a warrantless arrest.

In *Thompson*, at the time of the commencement of the criminal proceeding, the officers knew that plaintiff was not abusing his daughter. They were not aware of this fact at the time of the arrest. Therefore, the issue of when probable cause is judged takes on significance in this case, as it did in *Mejia*, *Supra*.

Unlawful Entry/Exigent Circumstances

The parties have previously addressed the Court as to exigent circumstances and which party bears the burden of proof on this issue.

It is plaintiff's position that the issue of exigency must be taken in context of prior controlling rulings in this district. For example, while it is no doubt true that the police officers had a reason to be at the plaintiff's apartment, the issue in this case is whether the forced entry into the plaintiff's apartment complied with the Fourth Amendment. As was explained by Judge Edward Korman in *Fernandez v Sacco*, 2012 US Dist LEXIS 174886, at *12-17 [EDNY Dec.

10, 2012, No. 10 CV 1624 (ERK) (RML)]:

> Two Second Circuit cases are most relevant to this analysis: *Kerman* and *Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003). In *Kerman*, police officers responded to the plaintiff's apartment based on a 911 call made anonymously from a different location. 261 F.3d at 232. The caller had told the 911 operator that "a mentally ill man at this location was off his medication and acting crazy and possibly had a gun." *Id*. In the caller's conversation with the 911 operator, she did not mention her relationship to the plaintiff nor did she provide the plaintiff's name. *Id*. When the officers arrived, the plaintiff "opened the door a crack" in response to the officers. *Id*. The officers then forcibly entered the apartment. *Id*. Under these circumstances, the Second Circuit held that the warrantless entry into the plaintiff's apartment violated the Fourth Amendment because the uncorroborated 911 call was insufficient to provide the probable cause to believe there was an urgent need to render aid to a person in distress. *Id*. at 236. This holding rested on the absence of evidence in the record to corroborate the 911 call and the fact that private dwellings are "ordinarily afforded the most stringent Fourth Amendment protection." *Id*. (quoting *Ayeni v. Mottola*, 35 F.3d 680, 685 (2d Cir. 1994), *abrogated on other grounds by Wilson v. Layne*, 526 U.S. 603, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)).

> By contrast, in *Anthony*, police officers responded to a 911 call "in which a female caller reported that she was being attacked by a man with a knife and a gun." 339 F.3d at 131. The apartment to which the officers responded was also the apartment from which the 911 call was made. *Id*. Based on those facts, the Second Circuit held the officers' forced entry was justified by exigent circumstances. *Id*. at 136-37. Specifically, it observed that *Anthony* was unlike *Kerman* because "the call came from the same location to which police responded, and, more importantly, the caller described an immediate and deadly threat of harm to which she herself was being exposed at that location." *Id*. at 136. Unlike *Anthony*, the information Ms. Roth provided did not originate inside the apartment that the officers forcibly entered and searched. Nevertheless, the police spoke to the neighbor, Ms. Roth, whom the evidence clearly suggests was the 911 caller. Specifically, the 911 operator was able to trace the call to second apartment in the two-family house in which the Fernandezes resided. Moreover, Ms. Roth said she was babysitting her grandson. While these facts take this case out of the realm of a search based on an anonymous call, the problem is that Ms. Roth's report of a "loud ruckus upstairs" and "loud voices" that "sounded like an argument" did not rise to the danger and immediacy, nor did they contain the specificity, of the *Anthony* report that the caller herself was presently being attacked with deadly weapons. Significantly, on the basis of the record on which this motion must be resolved, the observations of the police officers were not sufficient to raise any concern about the safety of persons inside the Fernandez home.

> A more recent case discussing *Kerman* and *Anthony* is also instructive here. In *United States v. Sikut*, an anonymous 911 call was placed by an anonymous neighbor reporting "a domestic" at the plaintiff's home. 488 F. Supp. 2d 291, 297 (W.D.N.Y. 2007). The caller reported that the noise in the plaintiff's apartment "sounds like a physical fight, you can hear people going at the walls, rumbling down stairs, it's really aggravating." *Id*. A

police officer was dispatched to respond to the "domestic" and was informed that the police had received a similar phone call four months earlier with a similar report about the same location which turned out not to be a "domestic," but instead was an elderly male that had fallen in the apartment's kitchen. *Id*. Upon arrival, an officer knocked on the front door, rang the doorbell and announced himself as a police officer. *Id*. The door went unanswered. *Id*. The officers could not see inside the apartment because the shades were drawn and there were no signs of activity within the apartment. *Id*. at 298. At that point, the officers spoke with a woman who resided in an adjoining apartment who admitted to making the 911 call. *Id*. She repeated the statements that she made earlier on the 911 call. *Id*. After a brief investigation of "the matter to determine its potential exigency," the officers entered the apartment through a rear door to the apartment, which they claim to have found unlocked. *Id*. at 299. Based on these facts, the district judge held that based on the prior inaccurate 911 call and "the absence of independent evidence directly corroborating the present caller's complaint, it was not objectively reasonable for the officers to conclude that the 911 caller was sufficiently reliable to demonstrate that exigent circumstances were present." *Id*. at 308-09.

As in *Sikut*, the information relayed to the police officers in the instant case was "not [from] the alleged victim, nor from a person within the potential victim's residence." *Id*. at 307. Both of these factors distinguish both *Sikut* and this action from *Anthony*, in which the 911 "caller expressed the belief that she faced 'an immediate and deadly threat of harm.'" *Id*. (quoting *Anthony*, 339 F.3d at 136-37). Moreover, the report by the 911 caller in *Sikut* is remarkably similar to Ms. Roth's report (both the 911 call and in person). Both described the general sounds of an altercation but were non-specific and could not be corroborated by the responding officers' observations. On the contrary, the appearance of the Fernandezes and Fonsecas at the door to the Fernandez home and the alleged insistence of all four that nothing was amiss arguably suggests an inference that there was no immediate need for an exigent-circumstances entry.

Here, it is plaintiff's position that the jury should be instructed as to the factors which the Second Circuit has found to be controlling as to whether a warrantless entry into a home is justified. The jury should be informed of the following factors:

1. Whether the harm was occurring to the 911 caller or someone else.
2. Whether the caller called from the premises of the incident or from another location.
3. Whether there was any observations by the police which tended to corroborate the content of the call when the police arrived.
4. Whether the harm was occurring at the time the call was made.
5. Whether the caller expressed the belief that "she" faced an immediate and deadly threat of harm.

It is plaintiff's position that controlling Second Circuit decision law has made clear that the above factors should be considered when determining whether a warrantless entry is justified and therefore the jury should be made aware of these factors to consider.

Thank you for your consideration.

        Very Truly Yours:

        /S

        David A. Zelman, Esq.