UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LARRY THOMPSON,

                              Plaintiff,

        – against –

Police Officer PAGIEL CLARK; Police
Officer PAUL MONTEFUSCO; Police
Officer GERARD BOUWMANS; Police
Officer PHILLIP ROMANO,

                              Defendants.

**MEMORANDUM AND ORDER**

14-CV-7349

**JACK B. WEINSTEIN, Senior District Judge:**

**Parties**

Larry Thompson

Pagiel Clark
Paul Montefusco
Gerard Bouwmans
Phillip Romano

**Counsel**

**David A. Zelman**
612 Eastern Parkway
Brooklyn, NY 11225
718-604-3072

**Cary London**
30 Broad Street, Suite 702
New York, NY 10004
212-203-1090

**Kavin Suresh Thadani**
New York City Law Department
100 Church Street, Rm 3-195
New York, NY 10007
212-356-2351

**Phillip R. DePaul**
New York City Law Department
100 Church Street, Rm 3-208
New York, NY 10007
212-356-2413

**Table of Contents**

I.   Introduction ..................................................................................................................... 2

II.   Background ..................................................................................................................... 5

   A.   Warrantless Entry ..................................................................................................... 5

   B.   Dismissal of Plaintiff's Criminal Charges ............................................................. 8

      i.   State Criminal Prosecution ..................................................................... 8

      ii.   Criminal Court Appearances.................................................................. 9

      iii.   Evidentiary Hearing .............................................................................. 10

III.   Law ................................................................................................................................ 22

   A.   Burden of Proof for Exigency ................................................................................. 22

      i.   Exigent Circumstances Generally.......................................................... 22

      ii.   Other Circuit Precedent........................................................................... 23

      iii.   Second Circuit Precedent ........................................................................ 25

      iv.   Burden Shifting........................................................................................ 27

      v.   Burden of Proof Problem ........................................................................ 28

   B.   Termination in Favor of the Accused...................................................................... 30

IV.   Application of Law ....................................................................................................... 31

   A.   Exigency Burden ....................................................................................................... 31

   B.   Favorable Termination ............................................................................................. 33

V.   Conclusion ..................................................................................................................... 36

   A.   Exigent Circumstances Burden ............................................................................... 36

   B.   Malicious Prosecution .............................................................................................. 36

**I.    Introduction**

In this 42 U.S.C. § 1983 civil jury trial, two rules of law of the Second Circuit have been

applied that can and should be changed: 1) where the police enter a house without a warrant and

rely on exigent circumstances, the burden of proof on non-exigency is on the plaintiff-

householder; and 2) where a civil § 1983 plaintiff must prove his state criminal prosecution

ended in a ruling on the merits in his favor, an ambiguous ruling by the State court is construed

as a ruling that dismissal was not on the merits, that is to say it was not on a finding of non-guilt.

Both these rules erect an unnecessary barrier to justice; both improperly limit enforcement of federal law in civil suits against police officers when they violate the constitution. They seriously dilute the force of the federal constitutional protection against police violators of constitutional rights.

It is trite but still true that a person's home is conceptually his castle. This principal was taken from English common law and chiseled into the granite of our Constitution. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall be violated . . . . "); *see also Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (citation omitted)). Its origins date as far back as the early 17th century.

> [T]he house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose; and although the life of man is a thing precious and favoured in law; . . . if thieves come to a man's house to rob him, or murder, and the owner of his servants kill any of the thieves in defence of himself and his house, it is not felony, and he shall lose nothing . . . . [E]very one may assemble his friends and neighbours to defend his house against violence: but he cannot assemble them to go with him to the market, or elsewhere for his safeguard against violence: and the reason of all this is, because domus sua cuique est tutissimum refugium.

*Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B. 1603); *see also* 4 William Blackstone, Commentaries 223 (1765–1769) ("And the law of England has so particular and tender a regard to the immunity of a man's house, that it stiles it his castle . . . .").

The present case forces a reassessment of this oft-repeated maxim. It poses questions about what the ordinary law-abiding citizen can, and should, do to protect himself and his family from an unwarranted, but possibly lawful, governmental intrusion into his home. *Compare* Jason

Brennan, *When All Else Fails: The Ethics of Resistance to State Injustice* 2, 4 (2019) ("[O]ne pressing question for political philosophy is what ordinary citizens are licensed to do in the face of injustice. . . . Instead of exit, voice, or loyalty, this book defends the fourth option: resistance. . . . [It] includes more active forms of resistance, such as blocking police cars, damaging or destroying government property, deceiving and lying to government agents, or combating government agents.") *with* I. Bennett Capers, *Criminal Procedure and the Good Citizen*, 118 Colum. L. Rev. 653, 663 (2018) ("[T]he good citizen should not hesitate to open his bag, pocket, or home to the police, or to otherwise consent to a search.").

Plaintiff Larry Thompson brings this action against defendant police officers pursuant to 42 U.S.C. § 1983. The litigation results from an encounter between police officers responding to a report of serious baby abuse and a new father intent on protecting his family from what he believed to be an unlawful forced entry into his apartment.

At 10:00 p.m. one evening in Brooklyn, plaintiff, his wife, and their one-week old daughter were at home preparing for bed. Four armed uniformed police officers arrived at their door seeking to enter the apartment without a warrant. The officers were there to investigate a partially corroborated 911 call reporting that a child was being molested.

They believed the exigency of an ongoing possible threat to a child's safety justified their warrantless entry. Thompson, with his child safe and well-cared for in the back bedroom, believed otherwise. He blocked them from entering and, according to the officers' testimony, pushed one of the officers. They forced him to the ground, arrested him, handcuffing him, and according to plaintiff, beat him. The report of child abuse turned out to be false—the 911 call came from a disturbed relative temporarily living in plaintiff's apartment. The child was never in any danger.

Before the court are two vexing issues related to plaintiff's unlawful entry and malicious prosecution claims: *first,* which party bears the burden of proof on the exigent circumstances exception to the warrant requirement; and, *second,* whether, as an element of his malicious prosecution claim, plaintiff can establish that his criminal charges were terminated on the merits in his favor. This memorandum addresses both issues.

## II. Background

### A. Warrantless Entry

At about 10:00 p.m., on the night of January 15, 2014, plaintiff was home with his fiancé, now wife, and new born baby in their Brooklyn apartment. Trial Tr. 601:12–24, Jan. 25, 2019. The family was getting ready to go to sleep. *Id.* at 601:22–24. The Thompson's were in their underwear. *Id.* at 601:20–602:1. Earlier that day, the parents had taken their one-week old daughter to her first doctor's check-up. *Id.* at 598:1–14. She received a clean bill of health. *Id.* at 598:15–18.

His wife's sister, Camille Watson, who was staying in the couple's apartment, called 911. Trial Tr. 263:14–24, Jan. 24, 2019. She reported that her week-old niece was being sexually abused by the baby's father at 339 Lincoln Place, Apt. 2E, in Brooklyn. Trial Tr. 496:13–18, Jan. 25, 2019. She identified the father as a 41-year-old black male, roughly five feet five inches tall, and 150 pounds. *Id.* Plaintiff met that description. *See id.* at 508:11–509:8. She stated that the baby had red rashes on her buttocks area. *Id.* at 496:13–18.

Two Emergency Medical Technicians ("EMT") were directed to the scene by radio to investigate the report of child abuse. *Id.* at 456:20–25. They were met outside by a woman who did not identify herself, but they assumed to be the 911 caller. *Id.* at 461:5–10. The female, later identified as Camille, asked the EMTs to follow her. *Id.* at 461:12–14. Camille led them into the

apartment where they observed another woman holding a baby. *Id*. at 461:15–25. The EMTs were confronted by plaintiff. *Id*. at 462:19–462:6. Thompson appeared angry and asked them what they were doing in his apartment. *Id*. at 463:20–464:18. He denied that anyone in the apartment called 911. *Id*. at 464:12–18. The EMTs told him that they might have the wrong address and left. *Id*. at 464:19–21.

Police Officers Pagiel Clark, Paul Montefusco, Gerard Bouwmans, and Phillip Romano received a radio direction to respond to 339 Lincoln Place and investigate a man fitting plaintiff's description for suspected child abuse. *See id*. at 503:7–504:9. The call first came over as a report of "possible child abuse," but was later changed to an "assault in progress." Trial Tr. 334:15–335:2, Jan. 24, 2019. The EMTs informed the arriving officers that they received a report of a child being abused and they needed to check on the baby. Trial Tr. 464:8-465:18, Jan. 25, 2019; *see also id*. at 480:5–6 ("If we don't make patient contact, then we get in trouble."). They told the police officers that they had left the apartment without examining the baby because plaintiff seemed "aggressive" and they felt "uncomfortable." *See id*. at 465:16–18, 478:3–479:9.

One officer knocked on the door of apartment 2E and Thompson opened it. *Id*. at 510:10–16, 515:22–516:2. The officers stood outside of the apartment door. *Id*. at 510:17–511:14. They were armed and in uniform. *Id*. at 512:12–20. They told Thompson that they needed to enter the apartment. Trial Tr. 295:11–14, Jan. 24, 2019. He responded that they were not coming in without a warrant and refused to let them pass. Trial Tr. at 611:1–10, Jan. 25, 2019.

Officer Montefusco attempted to cross the threshold. *See id*. at 523:2–15; Trial Tr. 303:23–304:1, Jan. 24, 2019. Thompson blocked his path and, according to the officers'

testimony, shoved Officer Montefusco. *E.g.*, Trial Tr. 523:16–19, Jan 25. 2019; Trial Tr. 107:18–21, Jan. 23, 2019. The officers rushed in, pushing Thompson to the floor and handcuffing him. Trial Tr. 524:2–10, Jan. 25, 2019. Thompson testified that he did not resist arrest, but that Officer Montefusco threw him to the ground and began to choke him, while the other officers kicked and punched him. Trial Tr. 711:24–712:15, Jan. 28, 2019. Defendants contend that he resisted arrest by flailing his arm preventing the officers from placing handcuffs on him. Trial Tr. 570:16–24, Jan. 25, 2019.

The officers entered the apartment with the EMTs. *Id*. at 485:4-5. The EMTs observed red marks on the baby's buttocks but determined, after taking the child to the hospital, there was only a diaper rash. *See id*. at 486:2–7; Pls.' Summ. J., Ex. D, Dillahunt Dep. 25:1–25. There was no evidence of abuse. *See* Trial Tr. 486:2–7, Jan. 25, 2019.

Camille, who had called in the false report, suffered from mental illness. Trial Tr. 237:16–20, Jan. 24, 2019. The police sensed that she had some form of mental dysfunction. *Id*. at 324:3–13.

Thompson was transported in a police patrol car to the seventy-seventh precinct. Trial Tr. 538:16–22, Jan. 25, 2019. He requested medical attention for back and neck pain, and was brought by two of the officers to Interfaith Hospital. *See id*. at 539:9–540:8; Def. Ex. F, Interfaith Hospital Medical Records, Jan. 16, 2014. An x-ray showed swelling, but no permanent injury. *See* Def. Ex. F; Trial Tr. 636:23–637:1, Jan. 25, 2019. Pain medication and a neck brace were prescribed. Trial Tr. 635:18–19, Jan. 25, 2019; Trial Tr. 330:7–9, Jan. 24, 2019. He was returned by the police to the precinct and then was transported to Brooklyn Criminal Court. Trial Tr. 637:12–638:7, Jan. 25, 2019.

**B. Dismissal of Plaintiff's Criminal Charges**

**i.   State Criminal Prosecution**

Thompson was arrested on January 15, 2014 following the incident in his home.  *Id.* at

530:11–531:3.  He was charged with obstructing governmental administration in the second

degree, NYPL § 195.05, and resisting arrest, NYPL § 205.30.  *Id.* at 531:24–532:7.  A person is

guilty of obstructing governmental administration in the second degree in New York,

> when he [or she] intentionally obstructs, impairs or perverts the
> administration of law or other governmental function or prevents or
> attempts to prevent a public servant from performing an official function by
> means of intimidation, physical force or interference, or by means of any
> independently unlawful act, or by means of interfering . . . .

N.Y. Penal Law § 195.05.

Under New York law, this crime has four elements: "(1) prevention or attempt to prevent

(2) a public servant from performing (3) an official function (4) by means of intimidation, force

or interference."  *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010).  Police officers

must be engaged in lawful conduct to support an arrest for obstruction.  *Kass v. City of New*

*York*, 864 F.3d 200, 207 (2d Cir. 2017) ("[T]he public servant must be performing an official

function that is 'authorized by law.'" (citation omitted)).

"'Interference' within the meaning of Section 195.05 must be a 'physical interference.'"

*Basinski v. City of New York*, 706 F. App'x 693, 698 (2d Cir. 2017) (citing *People v. Case*, 42

N.Y.2d 98, 101 (1977)).  "New York courts, however, have construed 'physical interference'

broadly."  *Id.* (citing *In re Davan L.*, 91 N.Y.2d 88, 91 (1997)).  As the United States Court of

Appeals for the Second Circuit explained in *Kass v. City of New York*:

> The [next] element is that an individual must prevent or attempt to prevent
> a public official from performing a lawful official function by interfering
> with that function.  Although the interference must at least in part be
> "physical" and cannot consist solely of verbal statements, an officer may

consider both words and deeds in determining whether the individual's conduct is sufficiently obstructive to justify an arrest. Such interference can consist of inappropriate and disruptive conduct at the scene of the performance of an official function even if there is no physical force involved. This element of the statute is satisfied when an individual intrudes himself into, or gets in the way of, an ongoing police activity.

864 F.3d at 207 (citations omitted).

A person is guilty of resisting arrest when he or she "intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person." N.Y. Penal Law § 205.30. Probable cause for resisting arrest arises only when there is probable cause for charging some other crime. *Curry v. City of Syracuse*, 316 F.3d 324, 336 (2d Cir. 2003).

### ii. Criminal Court Appearances

Plaintiff was arraigned on January 17, 2014. After being held in custody for two days, he was released on his own recognizance. *See* Trial Tr. 658:4–18, Jan. 25, 2019.

Thompson next appeared in court about two months later. According to his testimony, he was offered an Adjournment in Contemplation of Dismissal and told to "stay out of trouble and everything will go away." *Id.* at 644:14–16. He rejected this offer because he "ha[d] to see this to the end" and "didn't think . . . anything should be on [his] record about this." *Id.* at 644:18–645:4.

He returned to court a month later on April 9, 2014. At this hearing, his criminal charges were dismissed "in the interest of justice" on motion of the Brooklyn District Attorney. The entire transcript of this hearing reads:

Proceedings

COURT OFFICER:   Calendar add-on 2014KN004196, Thompson.

9

> MS. LUNN [defense counsel]:   The people have agreed to dismiss.   It's Mr.
> Scott's case.   We advanced it from – –
> MS. TIERNY:   People are dismissing the case in the interest of justice.
> THE COURT:   The matter is dismissed.

Def. Ex. B, Transcript of State Criminal Proceeding, Apr. 9, 2014.

Neither the prosecution nor the court provided any specific reasons on the record for the dismissal.  Nor was there any mention of the charges being dismissed pursuant to New York Criminal Procedure Law ("CPL") § 170.40, which is the section of the CPL devoted to interest of justice dismissals.  Section 170.40 of the CPL requires the court to state its reasons on the record for dismissing a matter in the interests of justice.  *See* N.Y. Crim. Proc. Law § 170.40 ("An order dismissing an accusatory instrument . . . in the interest of justice may be issued upon motion of the people or of the court itself as well as upon that of the defendant.  Upon issuing such an order, the court must set forth its reasons therefor upon the record.").

Plaintiff's Certificate of Disposition states that the charges were dismissed on motion of the District Attorney and indicates that the case was sealed pursuant to CPL § 160.50.  Pl. Ex. 5, Certificate of Disposition, Apr. 8, 2015.  This State sealing provision, entitled "Order upon Termination of Criminal Action in Favor of the Accused," is applicable only to those whose criminal actions were terminated in their favor (as defined within CPL § 160.50(3)).  *See* N.Y. Crim. Proc. Law § 160.50.

### iii.   Evidentiary Hearing

An evidentiary hearing was held on January 24, 2019 in federal court.  Renate Lunn, a Legal Aid attorney and plaintiff's former defense counsel, testified regarding her recollections of plaintiff's criminal prosecution.

On direct examination, defense counsel Lunn said she could not remember why the prosecutor moved for dismissal. *See* Trial Tr. 209:19–24, Jan. 24, 2019. She testified that she had never filed a motion to dismiss in the interest of justice. *Id*. at 207:23–25. She did recall making an oral motion to dismiss for facial insufficiency on the ground that the complaint did not lawfully state a crime. *Id*. at 210:6–9. The criminal court judge denied this motion and allowed her to put the motion in writing, which she never did. *Id*. at 210:11–211:2.

> Q Ms. Lunn, I bring your attention to January 15th of 2014 where were you employed?
>
> A  Legal Aid Society in New York City.
>
> Q Did there come a time when you represented a gentleman named Larry Thompson?
>
> A Yes.
>
> Q Do you remember what Larry Thompson was charged with?
>
> A I'd have to refresh from my recollection by looking at the complaint, but I believe it was obstructing governmental administration, resisting arrest.
>
> Q Were you the assigned attorney for Legal Aid Society for his case?
>
> A Yes.
>
> Q Did he plead guilty or was his case dismissed?
>
> A His case was dismissed.
>
> Q Did you file a motion under the interest of justice to have the case dismissed?
>
> A No.

Q Did you -- in your legal opinion, can you just tell us what happened when you went to court with this case for the best of your recollection?

A The first time it was on, I think the prosecution provided discovery. It was adjourned -- well, after arraignment, it was adjourned for discovery, we received some discovery. And then, after that, the next court date it was dismissed. . . .

Q Was there any evidence at all in the case that this case was dismissed out of sympathy for the accusation or for any ill health reason that he had? . . .

A May I look at my notes to refresh my recollection? I have notes from my conversation with prosecutors. . . . I'm just looking. I don't have any information about health issues. And when I spoke to the prosecutor, what I remember about this case was just being outraged at the thought that someone could be arrested for obstructing governmental administration in his own home. But I don't have detailed notes about any sort of sympathetic mitigating circumstances like I would have if I was doing a motion for dismissal in the interest of justice.

Q Understood. Was there any discussion that you recall between you and the prosecutor that there was an inability to proceed by the prosecutor due to a lack of reasonable doubt -- lack of probable cause that the case could continue in court to a successful conclusion?

A I honestly don't remember.

Q Okay. Was there any -- do you remember any specific evidence that was brought out in the discovery? You touched upon it that he was in his house,

that he was arrested, [do] you remember having a conversation with the prosecutor or the judge that it would be impossible to prosecute him for being in his house and obstructing at the same time?

A Yes. I made a motion at the arraignment to dismiss for facial sufficiency which would be not in -- not out of mitigating circumstances, but because -- the complaint doesn't even state a crime. It could not legally state a crime.

Q Was there an opposition to that?

A I think it was asked [by the court] that I put it in writing.

Q  And did you?

A  No. . . . The court denied any oral application to dismiss without prejudice.

Q And asked you to put it in writing?

A Yes.

Q Subsequently, the D.A. -- did the D.A. tell you they were moving to dismiss . . . ?

A Yes.

Q Did they say anything in regards to that why anything that you recall about that conversation?

A I don't recall anything about the conversation.

Q Okay. And what was the time, from the time that you made the oral application to dismiss, to the time that the prosecutor said they're going to dismiss on their own, how long was that?

A I made the oral application at arraignment, and the actual dismissal happened on the second adjourn date. . . .

*Id.* at 207:8–211:14.

Defense counsel Lunn was asked generally about interest of justice dismissals under CPL § 170.40.

Q Isn't it true, Ms. Lunn, that there is a specific CPL provision regarding interest of justice dismissal[s] . . . ?

A Yes.

Q Do you recall what that [is]?

A Off the top of my head, no, I remember we call it by the lead case. It's known as a Clayton motion in New York City.

Q I believe it's CPL 170.40.

A That sounds right. . . .

Q CPL 170.40 is the interest of justice dismissal provision of the CPL; is that correct?

A Yes. I recently filed such a motion or drafted such a motion so I'm familiar with the standards and the factors the court should look at that are listed in 170.40.

Q Please tell us what you know about the statute?

A It's a motion that can be made . . . to dismiss a case in the interest of justice. There's a series of factors that can be looked at. History and character of the defendant, the nature, if any, of police misconduct. The effect that dismissing the case would have on the community's trust and

faith in the criminal justice system. The level of guilt of the defendant and any harm that was done to anybody. There's a series of factors that the court may consider not one is necessarily dispositive.

Q Do you recall if there's a provision in CPL 170.40 which requires the criminal court, if it's going to make a dismissal in the interest of justice, to state its reasons on the record?

A I don't remember off the top of my head.

Q Were any?

COURT: It says, "Upon issuing such an order, the Court must set forth its reasons, therefore, on the record."

Q Was that done?

A No.

*Id.* at 217:3–220:14.

On cross-examination, she was shown the transcript from the April 9, 2014 hearing. *Id.* at 212:11-17. She testified that she did not remember any discussions taking place at the criminal court proceeding that were not contained in the transcript. *Id.* at 214:6-9.

Q Let the record reflect that I have shown Ms. Lunn Defense Exhibit B. Ms. Lunn, do you recognize that document?

A Yes.

Q What does it appear to be to you?

A A transcript of a proceeding in criminal court on April 9, 2014. . . .

Q And in what case does this transcript pertain to?

A People v. Larry Thompson.

Q Is this the transcript for the underlying criminal case against Mr. Thompson that this lawsuit is currently about?

A Yes.

Q And what is the date on the transcript?

A April 9, 2014. . . .

Q Does that accurately reflect the conversation that took place before the criminal court on the last day of the underlying criminal case against the plaintiff, Mr. Thompson?

A I don't have an independent recollection to say. I don't have any reason to doubt it and I don't have any reason to believe that that's more or less accurate than any other transcript. . . .

Q And is there any information or anything that was that you recall being said at the last criminal court proceeding that's not contained within this transcript?

A Not that I recall but, of course, if we'd been called to the bench to discuss it, or if there had been some discussion that was off the record that wouldn't be in the transcript but I don't remember anything like that. . . .

Q So you have no specific recollection. Any other conversation for the court besides what's contained in this transcript?

A Correct.  . . .

Q And [the transcript] states, you state, "The People have agreed to dismiss. It's Mr. Scott's case. We advanced it from." I read that correctly; right?

A Yes.

Q And Ms. Tierney speaks next. . . . Was she an assistant district attorney?

A I believe so, but it doesn't necessarily mean she's the one assigned to the case. The way courts work in Brooklyn is that there is one district attorney assigned to a courtroom. So she's handling all the cases in the courtroom. It would be very unlikely that it was her particular case. . . .

Q I understand that, Ms. Lunn. But Ms. Tierney was there on behalf of the People of the State of New York as an assistant district attorney prosecuting the case on that day?

A Yes, correct.

Q Ms. Tierney states people are dismissing the case in the interest of justice?

A Correct. . . .

Q And then the next thing is the court states the matter is dismissed; is that right?

A Correct.

Q There's no other information here?

A Correct.

Q You don't make any statements according to this transcript after Ms. Tierney said that the people are dismissing the case in the interest of justice; correct?

A Correct.

Q And you stated earlier that you actually previously made a motion before the court to have the case dismissed; right?

A Yes.

Q And that was orally denied; correct?

A Without prejudice.

Q But it was orally denied?

A Yes.

Q And there was no motion of yours granted in this criminal case; correct?

A Correct.

Q Is there anything in this transcript that affirmatively indicates that the case was being dismissed because there was an affirmative indication that the plaintiff was innocent of the charges he was charged of?

A Not in this transcript, no.

Q And it's correct that the prosecutor made the decision to dismiss the case; right?

A Yes.

*Id.* at 212:11–216:18.

Defendants questioned her about the Certificate of Disposition formally dismissing charges against plaintiff.

Q First of all, . . . referring specifically to Plaintiff's Exhibit 5, the certificate of disposition, you still have that document in front of you; correct?

A Yes.

Q It states that the case was dismissed on motion of the D.A.; is that right, if you refer your attention to the middle of the case under case "disposition information," do you see that about halfway down the page?

A Yes, I see that. . . .

Q [U]nder "court action" it states, "Dismissed -- motion of D.A." Correct?

A Correct.

Q And that's actually what happened, right, the case was dismissed on the motion of the D.A.; right?

A Correct.

Q There's nothing in this indicate that [states] the dismissal of the criminal charge affirmatively indicate that the plaintiff was innocent of charges?

A Correct.

Q There's nothing in the criminal court transcript that indicates that the plaintiff[']s charges against him were dismissed because there was an affirmative indication that he was innocent of the charges; correct?

A Correct.

Q And it was you don't know why the district attorney's office moved to dismiss the case, did you?

A No.

*Id.* at 220:19–221:21.

In an exchange in the federal hearing, defense counsel Lunn testified that she spoke with an assistant district attorney prior to the April 9, 2014 hearing and was told that the case would be dismissed. She could not recall the specifics of this discussion. *Id.* at 222:2–10. But the fact that she did not have detailed notes on mitigating factors led her to believe that the discussion was purely about the legal deficiencies of the case. *Id.* at 222:11–21. She added that, based on her experience and the facts of the case, she did not think it was lawful to arrest the plaintiff for refusing to allow the police into his home. *Id.* at 223:16–25.

COURT: Well, Ms. Lunn, you state on the record, "The People have agreed to dismiss." Does that suggest that you had a conversation with the prosecutor?

WITNESS: I did have a conversation with the prosecutor before that court date.

COURT: And what did you and the prosecutor say?

WITNESS: I honestly don't remember. In looking at my notes from my conversations with Mr. Thompson, I don't have a lot of notes on mitigating factors and sympathetic factors about his work history or his family history, so I don't -- but I'd be speculating as to exactly what I was saying. I can only say that if I had detailed notes, there's some cases where I might have detailed notes about someone's work history, their mental health issues, what's going on in their lives. And so, those are things [that] I'm calling a prosecutor [with] and sharing with them in the hopes of getting a better disposition. The lack of those notes in the file makes me leads me to believe that the conversation was just about the fact that he was charged with obstructing governmental administration in his own home that there was a legal problem with the case. . . .

COURT: But you had made an oral motion to dismiss [for facial insufficiency], had you not?

WITNESS: Yes.

COURT: And the court denied it?

WITNESS: Correct.

COURT: Asking you to put it in writing?

WITNESS: Correct.

COURT: Did you?

WITNESS: No.

COURT: Do you remember how you argued that motion? What you said?

WITNESS: May I look at the complaint? May I have a moment to refresh my recollection and look at the complaint? . . . In order for a complaint charging resisting arrest to be facially sufficient, there has to be an allegation that of the arrest was lawful, and in this complaint, the allegation is that the . . . the police officers instructed Mr. Thompson to allow them into his home and he refused to let them into their home. And in order to be placed under arrest, that was my understanding, and it does not seem to me . . . a lawful arrest to arrest someone for not allowing the police into their home. . . . What I do remember about the case when [plaintiff's attorney] called me was the idea that someone was arrested in their home for not letting the police into their home. And I think that's what I would have brought to the court's attention that very first time that I saw the complaint.

COURT: Anything you want to say that may help decide what the nature of the dismissal was? . . .

WITNESS: The nature of criminal court as it's practiced in New York City is that there is an assigned attorney in each courtroom who just has a stack of files and handles stands up on every case and that's in front of them and their files aren't always detailed they're just reading from whatever notes the

actual assigned assistant district attorney assigned to particular cases has left for them.

COURT: That may not be the assistant speaking in court as indicated in the record before us.

WITNESS: Exactly. So the assistant speaking in court is not necessarily the person who has reviewed the case and made a decision about it. She is usually reading off of what's call[ed] a status sheet, some sort of printout that her colleague has provided for her. . . .

COURT: You say on Line 3 the People have agreed to dismiss Mr. Scott's case and the attorney for the state says the People are dismissing the case. So she made the motion but it was not her case; is that correct?

WITNESS: Yes. I have in my notes that I spoke to assistant district attorney Terry Scott on April 3rd.

COURT: Does it show what you spoke to him about.

WITNESS: No. All I wrote is, "They'll dismiss!" And then we agreed to advance the case to April 9th.

*Id.* at 221:24–225:21.

## III. Law

### A. Burden of Proof for Exigency

#### i. Exigent Circumstances Generally

"[A] principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek

to enter the home for purposes of search or arrest." *Welsh*, 466 U.S. at 748. Warrantless searches inside a home are illegal, unless an exception to the warrant requirement exists.

One exception is the presence of exigent circumstances. "[T]he essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) (citation omitted). "[P]olice officers may enter a dwelling without a warrant to render emergency aid to a person whom they reasonably believe to be in distress and in need of that assistance." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998). They may do this if, based on the totality of the circumstances known to the investigating officers at the time of entry, it was "objectively reasonable" for them to do so. *See id*.; *Mincey v. Arizona,* 437 U.S. 385, 393–94 (1978) ("[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." (citation omitted)).

### ii.   Other Circuit Precedent

In criminal cases, it is well-established that the police officers bear the burden of proving exigent circumstances. *See, e.g.*, *Welsh*, 466 U.S. at 749–750 ("[E]xceptions to the warrant requirement are few in number and carefully delineated, and . . . the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."); *Kentucky v. King*, 563 U.S. 452, 474 (2011) ("[T]he police bear a heavy burden . . . when attempting to demonstrate an urgent need that might justify warrantless searches.").

The law is less clear in a civil action under 42 U.S.C. § 1983. There is a split among the circuit courts over which party has the burden of proof in civil cases.

The United States Court of Appeals for the Third, Sixth, Ninth, and Tenth Circuits have assigned the burden of proof on the government. *See Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996); *Hardesty v. Hamburg Township*, 461 F.3d 646, 655 (6th Cir. 2006) abrogated on other grounds by *Morgan v. Fairfield Cty., Ohio*, 903 F.3d 553 (6th Cir. 2018); *Hopkins v. Bonvicino*, 573 F.3d 752, 764 (9th Cir. 2009); *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010). These courts generally rely on criminal cases for support. *See*, *e.g.*, *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d at 1070 (citing *United States v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008) (reversing district court's denial of criminal defendant's motion to suppress evidence obtained in violation of the Fourth Amendment)).

By contrast, the United States Court of Appeals for the Seventh and Eighth Circuits have placed the burden of proof on the plaintiff. *Bogan v. City of Chicago*, 644 F.3d 563, 568 (7th Cir. 2011); *Der v. Connolly*, 666 F.3d 1120, 1128 (8th Cir. 2012). They base their conclusion largely on what they describe as the "established principles governing civil trials," refusing to adopt the criminal governmental burden in civil actions. *E.g.*, *Bogan v. City of Chicago*, 644 F.3d at 570 ("[E]mploying a criminal burden of proof is contrary to established principles governing civil trials, namely, that the ultimate risk of nonpersuasion must remain squarely on the plaintiff." (citations omitted)); *cf. Crowder v. Sinyard*, 884 F.2d 804, 824 (5th Cir. 1989) ("Applying the long-standing rule that the plaintiff bears the burden of proving each essential element of a claim, we agree that the court erred in placing upon the defendants the burden of proof" with respect to the plain view exception to the warrant requirement.).

### iii.    Second Circuit Precedent

The leading case in the United States Court of Appeals for the Second Circuit on this issue appears to be *Ruggiero v. Krzeminski*, 928 F.2d 558 (2d Cir. 1991).  It indicates that the court shares the apparent view of the Seventh and Eighth circuits.

In *Ruggiero*, plaintiffs brought § 1983 claims for an unlawful search alleging that defendant police officers' warrantless search of their home was not excused by one of the exceptions to the warrant requirement, such as consent.  *Id.* at 560.

A question on appeal was whether the trial judge erred by failing to instruct the jury that the burden of proving an exception to the Fourth Amendment warrant requirement rested on the defendants.  *Id.* at 562.  The court expressly rejected the argument that once a plaintiff established that the search was not authorized by a warrant, the burden shifted to the defendant to prove that the search was justified by a specific exception.  *See id.* at 563.  It explained:

> It is true that searches and seizures conducted without warrants are *presumptively unreasonable*. The operation of this presumption, contrary to the Ruggieros' contention, cannot serve to place on the defendant the burden of proving that the official action was reasonable. Rather, the presumption may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions to the warrant requirement. However, *the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials. See Fed.R.Evid. 301*. We see no reason to depart from the usual allocation of burdens in a civil trial.

*Id.* (emphasis added) (citations omitted).

The Court of Appeals for the Second Circuit has not overruled *Ruggiero.  See Tirreno v. Mott*, 375 F. App'x 140, 142 (2d Cir. 2010) (providing a summary of Second Circuit precedent post-*Ruggiero*).  It continues to cite it approvingly in cases involving the exigent circumstances exception.  *See, e.g., Harris v. O'Hare*, 770 F.3d 224, 234 n.3 (2d Cir. 2014), as amended (Nov. 24, 2014) ("Of course, as in all civil cases, 'the ultimate risk of non-persuasion must remain

squarely on the plaintiff in accordance with established principles governing civil trials.'" (citing *Ruggiero*, 928 F.2d at 563)); *Tierney v. Davidson*, 133 F.3d at 196 ("A[n] . . . important distinction is that the burden in the state [criminal] action was on the state to prove that an exception to the warrant requirement applied, whereas [in civil cases] the burden is on [the plaintiff] to establish that the search was unlawful." (citing *Ruggiero*, 928 F.2d at 563)); *cf. Jackson v. City of New York*, 29 F. Supp. 3d 161, 176 n.20 (E.D.N.Y. 2014) (stating that the presumption that warrantless searches are unreasonable "does not shift the burden of persuasion to defendants" (citing *Ruggiero*, 928 F.2d at 563)).

Yet, some uncertainty apparently remains regarding the scope and propriety of the Second Circuit's policy. Post-*Ruggiero*, the court has, on occasion, adopted the criminal burden of proof in civil cases involving exceptions to the warrant requirement. In *Anobile v. Pelligrino*, 303 F.3d 107 (2d Cir. 2002), a § 1983 action challenging the lawfulness of a warrantless search, the court neither distinguished nor cited *Ruggiero* for its assertion that "[t]he official claiming that a search was consensual has the burden of demonstrating that the consent was given freely and voluntarily." *Id.* 124 (citation omitted). Similarly, in *Loria v. Gorman*, 306 F.3d 1271 (2d Cir. 2002), a § 1983 case alleging unlawful entry, the court failed to cite *Ruggiero*, instead relying on *Welsh v. Wisconsin*, for its conclusion "that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Id.* at 1284–85 (citation omitted). Some district courts in this circuit have placed the burden of persuasion on the police. *See*, *e.g.*, *Webster v. City of New York,* 333 F Supp. 2d 184, 194 (S.D.N.Y. 2004) ("Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." (citation

omitted)); *Palmieri v Kammerer*, 690 F Supp. 2d 34, 44-45 (D Conn 2010) ("The police officer, however, bear[s] a heavy burden when attempting to demonstrate an urgent need." (alteration in original) (citation omitted)).

### iv. Burden Shifting

*Ruggiero* recognizes that warrantless searches create a presumption of unreasonableness that "may cast upon the defendant the burden of produc[tion]." *Id.* at 563. But it maintains "established principles governing civil trials" require that the burden of persuasion remains with the plaintiff. *Id.*; *cf. Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981) (finding that, in employment discrimination cases, while defendant carries the burden of production to rebut plaintiff's prima facie case of discrimination, plaintiff retains the burden of persuasion); *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 76 n.5 (2d Cir. 2002) (noting how the Civil Asset Forfeiture Reform Act of 2000 overhauled civil forfeiture procedure by placing the burden of proving, by a preponderance of the evidence, the right to forfeiture on the government, who acts as the plaintiff).

The Second Circuit relies on the presumption definition, Federal Rule of Evidence 301, for the proposition that the burden of persuasion on exigency does not shift to the police. *Ruggiero*, 928 F.2d at 563. This is what Rule 301 states (emphasis added):

> In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. *But this rule does not shift the burden of persuasion, which remains on the party who had it originally*.

It is not necessary, however, to use "presumptions" at all, rather than a plain unvarnished "burden of proof" analysis.

The present rule placing pleading and proof burdens on plaintiffs in civil cases is not absolute. For example, the Second Circuit has held in false arrest cases that when an

arrest is made without a warrant, the defendant bears the burden of proving probable cause as an affirmative defense. *See,* e.g., *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016); *Raysor v. Port Auth. of New York & New Jersey*, 768 F.2d 34, 40 (2d Cir. 1985) ("[A] deprivation of liberty without 'reasonable cause' is a section 1983 violation as to which the defendant bears the burden of proving reasonableness . . . ." (citations omitted)); *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010). The Second Circuit has also held that, in customs forfeiture actions under 19 U.S.C.A. § 1595a, once the government demonstrates probable cause that the merchandise was used in illegal activities, the burden of persuasion then shifts to the claimant to show, by a preponderance of the evidence, that the merchandise is not subject to forfeiture. *See United States v. Davis*, 648 F.3d 84, 96 (2d Cir. 2011); 19 U.S.C. § 1615.

### v. Burden of Proof Problem

The Court of Appeals—like most courts—relies upon the often-confusing concept of presumptions in its analysis. *See Ruggiero v. Krzeminski*, 928 F.2d at 563. Instead, it should, it is respectfully suggested, rely on a clean and clear burden of proof analysis eliminating any reference to presumptions.

The issue before the court can best be summed up as a simple burden of proof problem. The burden is on the police to supply a warrant or some other rationale for entry into a person's home, such as "exigent circumstances" or "consent" or "hot pursuit." *See Weinstein's Federal Evidence* § 301App.01[4] at 301 App.–11 (2d ed. 2009) ("The considerations that determine which party shall bear responsibility for a particular aspect of the case are policy, fairness, and probability. . . . As a matter of policy, imposing the burden on plaintiff serves to handicap recovery in [certain] cases.

Fairness suggests access to evidence, ease of proof, and perhaps general considerations of credibility.").  This is not a problem of presumptions—a foggy term that should be avoided for it can be confusing to judges and juries.  *See* Fed. R. Evid. 301 advisory committee's note to 1974 Enactment (explaining courts' duties when instructing parties on presumptions).  The federal rule on presumptions—stating that presumptions should not shift burdens—was ultimately written after much dispute.  *See* Daniel J. Capra, *Advisory Committee Notes to the Federal Rules of Evidence That May Require Clarification* 4 (Federal Judicial Center, 1998) ("[Rule 301] is the culmination of a battle between two conflicting views on the effect a presumption should have. . . . The practical difference is in the quality and quantity of evidence required to overcome the presumption.").

By using the term "presumption" rather than "burden of proof"—which a jury can easily understand since a burden of proof definition is specifically, and clearly, written in the charge—the Court of Appeals has weakened the legal protections of the Fourth Amendment.  It has confused this issue, ignoring the fundamental importance of a person's constitutionally protected right to be free from unreasonable searches and seizures inside his or her home.

Rigid, mechanical approaches should not be adopted when assigning burdens in unlawful entry cases.  In support of an argument for protecting high standards to prove exigent circumstances, one author cites to Justice Bradley in *Boyd v. United States*, 116 U.S. 616, 635 (1886):

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that

> constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

Adrienne Lewis, Comment, *The Fourth Amendment – The Burden of Proof for Exigent Circumstances in a Warrantless Search Civil Action*, 65 SMU L. Rev. 221, 226–27 (2012). "The literal construction of burdens of proof in civil cases," she concludes, "is exactly the type of silent approach that leads to the 'gradual depreciation of the right' that Justice Bradley speaks of." *Id.* at 227.

"Allocating burdens of persuasion involves distinct substantive policies favoring one class of litigant over another." Jack B. Weinstein, Norman Abrams, Scott Brewer & Daniel S. Medwed, *Evidence Cases and Materials* 1351 (10th ed. 2017). The Second Circuit Court of Appeals has chosen to shift the odds towards the defendants, in effect, diminishing a plaintiff's ability to enforce his or her constitutionally protected rights as a householder. This appellate decision subverts the express will of the United States Constitution, which explicitly favors the rights of the house-dweller over that of police officers. The burden should be on governmental officials seeking to enter a home without a warrant. *See*, *e.g.*, *Payton v. New York*, 445 U.S. 573, 587 (1979) ("[A] greater burden is placed . . . on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." (citation omitted)).

## B. Termination in Favor of the Accused

As part of a § 1983 malicious prosecution claim, a plaintiff must prove his state criminal proceeding was terminated in his favor. *See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997).

"In general, the question of whether a termination was favorable to the accused is a matter of law for the court, but where questions remain as to the reason for the termination, this becomes an issue of fact for the jury." *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 413–14 (S.D.N.Y. 2018). "A dismissal out of mercy is not a favorable termination because mercy presupposes the guilt of the accused." *Arum v. Miller*, 273 F. Supp. 2d 229, 234-35 (E.D.N.Y. 2003) (citation omitted).

"[A] plaintiff asserting a malicious prosecution claim under § 1983 must . . . show that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence." *Lanning v. City of Glens Falls*, 908 F.3d 19, 22 (2d Cir. 2018); *see also Thompson v. City of New York*, No. 17CV3064(DLC), 2019 WL 162662, at *3 (S.D.N.Y. Jan. 10, 2019) (holding that plaintiff cannot show his criminal case was favorably terminated because his dismissal on speedy trial grounds does not affirmatively indicate his innocence). "[W]here a dismissal in the interest of justice leaves the question of guilt or innocence unanswered, . . . it cannot provide the favorable termination required as the basis for [that] claim." *Lanning*, 908 F.3d at 28–29 (citation omitted); *see also Hygh v. Jacobs*, 961 F.2d 359, 368 (2d Cir. 1992) ("A dismissal in the interest of justice is neither an acquittal of the charges nor a determination of the merits," thus leaving open the question of innocence or guilt. (citation omitted)).

## IV.  Application of Law

### A.  Exigency Burden

The Second Circuit's reasoning in *Ruggiero* is arguably broad enough to place the burden of proving all exceptions to the warrant requirement, including exigency, on the plaintiff.  But subsequent cases seem to go in the other direction, placing the burden of proving exigent circumstances in § 1983 actions on the government.  And its apparent suggestion that the burden

of persuasion never shifts to the defendant in civil trials is belied by other Second Circuit precedent.

Although the law in this circuit remains unclear, it appears that the current rule is that the plaintiff bears the burden of proof for exigent circumstances. This seems wrong as policy: the burden of proving an urgent need so compelling that it justifies a warrantless entry should generally rest with the government. Unlike consent, the facts that establish exigent circumstances are uniquely within the knowledge of the police officers. Whether there was a need to render emergency aid so compelling requiring immediate action is wholly dependent upon the facts often known only to the police officer at the time of the warrantless entry. The evidence available at the time to the householder is irrelevant. As is rightfully understood in the criminal context, police officers should bear a heavy burden when overcoming a person's fundamental right to be secure in the home from unreasonable searches and seizures. There is no sound basis in law for this principle not to extend to civil matters.

This is a simple problem of allocating the burden of proof. Since the Fourth Amendment has already chosen to favor a person's right inside his own dwelling over that of the police officer's right of entry, courts should do the same by placing the burden on police officers to prove that exigency justified their warrantless entry. *See* Lewis, *supra*, at 227 ("The [court's] holding is inconsistent with the Supreme Court's motivation to limit the situations where exigent circumstances make warrantless searches reasonable because it could lead to a situation where a plaintiff alleging violation of his civil rights is left without the ability to . . . defend those civil rights. The spirit of the Fourth Amendment is to give protective rights to citizens."); *cf. See* Capra, *supra*, at 4 ("The Advisory Committee reasoned that presumptions are based on a combination of probability and fairness. If that combination of factors is strong enough to

warrant a presumption, it should also be strong enough to shift the risk of nonpersuasion to the party against whom the presumption operates.")

**B. Favorable Termination**

Plaintiff failed to satisfy the favorable termination element of his § 1983 malicious prosecution claim as a matter of current Second Circuit law.  Based on the facts and law of this unusual case, where there was substantial evidence that the officers' warrantless entry was lawful and the plaintiff pushed, or at minimum physically interfered with, a governmental official, plaintiff cannot establish that his obstruction charge was dismissed in a manner affirmatively indicative of his innocence.  *See Lanning v. City of Glens Falls*, 908 F.3d at 25 (2d Cir. 2018) ("[F]ederal law defines the elements of a § 1983 malicious prosecution claim . . . [and] requir[es] affirmative indications of innocence to establish 'favorable termination' . . . .").

The federal court's ruling against defendant should not be based on the District Attorney moving to dismiss the criminal charges "in the interest of justice" at the April 9, 2014 hearing. Such a broad ruling risks eviscerating malicious prosecution claims altogether.  It would give prosecutors almost unlimited power to bar such claims, regardless of the strength or weakness of the underlying accusations.  They could insulate police officers and district attorneys simply by repeating the phrase "in the interest of justice" in all cases they sought to discontinue for any reason.  More must be required to qualify as an interest of justice dismissal that could, in effect, foreclose future claims for malicious prosecution.  *See Burke v. Town of E. Hampton*, No. 99-CV-5798, 2001 WL 624821, at *12 (E.D.N.Y. Mar. 16, 2001) ("In this Circuit, it is well established, as a matter of law, that '[a dismissal in the interests of justice] cannot provide the favorable termination required as the basis for a claim of malicious prosecution.'" (alteration in original) (citation omitted)).

In the present case, evidence was presented suggesting plaintiff's innocence. His case was sealed pursuant to CPL § 160.50, a provision for criminal prosecutions terminated in favor of the accused. He testified that he was offered an Adjournment in Contemplation of Dismissal at his second court date and told that if he accepted this offer, and stayed out of trouble, it would all "go away." Trial Tr. 644:5–16, Jan. 25, 2019; *but see Stampf v. Long Island R.R. Auth.*, No. 07-CV-3349 SMG, 2011 WL 3235704, at *3 (E.D.N.Y. July 28, 2011) ("[A]n adjournment in contemplation of dismissal is defined as a favorable termination pursuant to Section 160.50(3)(b), yet well-settled case law establishes that it is not a favorable termination for purposes of a malicious prosecution claim." (citation omitted)) aff'd in part, vacated in part sub nom. *Stampf v. Long Island R. Co.*, 761 F.3d 192 (2d Cir. 2014).

When his case was dismissed on motion of the Brooklyn District Attorney at the April 9, 2014 hearing, the prosecutor merely stated that the dismissal was "in the interest of justice." Def. Ex. B. There was no formal entry of an "interest of justice" dismissal pursuant to CPL § 170.40 (the State statute governing interest of justice dismissals). The court did not give its reasons on the record for a dismissal in the interest of justice, as required under State law. *See* New York Crim. Proc. L. § 170.40. There is little, if any, evidence that sympathy for the accused was a factor in the dismissal.

Plaintiff's defense attorney, Renate Lunn, testified credibly about her recollections of plaintiff's case. She said she never filed a motion for dismissal in the interest of justice. Trial Tr. 207:23–25, Jan. 24, 2019. She recalled making an oral motion to dismiss without prejudice for facial insufficiency, which was denied by the judge. *Id.* at 210:6–22; *see Russell v. Journal News*, 672 F. App'x 76, 78-79 (2d Cir. 2016) (finding that a dismissal without prejudice based on

facial insufficiency does not constitute a favorable termination because it is not a decision on the merits).

Defense counsel Lunn did not remember why the District Attorney moved to dismiss the case. She testified that, based on her experience, it would have been unlawful to prosecute Thompson for "not allowing the police into [his] home." Trial Tr. 223:16–25, Jan. 24, 2019. She recalled speaking to an assistant district attorney prior to the April 9, 2014 hearing and being told that the charges would be dismissed. *Id.* at 225:15–21. She observed that her notes did not contain any mention of mitigating circumstances, which she typically would have written down if she were seeking to persuade a prosecutor to dismiss a case out of mercy. *Id.* at 222:5–16. This indicates to her that the conversation with the assistant district attorney only concerned the legal shortcomings of the criminal case against Thompson. *Id.* at 222:17–21.

Left open is the question of how much evidence must be supplied by a plaintiff to show that the dismissal was essentially for innocence. Courts addressing this question should not forget that, in our criminal justice system, the accused are deemed innocent until proven guilty beyond a reasonable doubt. *See Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."). The assumption of innocence remains with a defendant throughout a case and is not overcome until either a plea is taken or a guilty verdict is returned. Thus, any ambiguity on whether the dismissal was on the merits should be decided in defendant's favor.

## V.    Conclusion

### A. Exigent Circumstances Burden

The general rule in civil cases—predicated on sound constitutional policy—should place the burden on police officers to prove, by a preponderance of the evidence, exigent circumstances justifying a warrantless entry. Placing the burden of persuasion on the civilian plaintiff is a repeated injustice that should stop now.

### B. Malicious Prosecution

Plaintiff's malicious prosecution claim should be treated as if it was on the merits—i.e., the defendant was not guilty. An ambiguous state dismissal should be accepted as being based on non-guilt, in part because of the assumption of innocence before conviction.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:    March 12, 2019
         Brooklyn, New York